Adams *v.* City of Shelbyville.

ADAMS *v.* CITY OF SHELBYVILLE.

[No. 18,998. Filed April 27, 1900.]

MUNICIPAL CORPORATIONS.—*Street Improvements.* — *Constitutional Law.*—The imposition of assessments for local improvements per front foot, irrespective of the question of accruing benefits, is in violation of the fourteenth amendment to the federal Constitution. *pp. 468-477.*

SAME.—*Street Improvements.—Constitutional Law.*—The legislature may create, or authorize the municipality to create, a local taxing district for local improvement purposes, which includes part only of the property within the municipality. *p. 478.*

SAME.—*Street Improvements.—Constitutional Law.*—The legislature may declare conclusively that only the property within the taxing district created for local improvements shall be specially assessed on account of the improvements within the district. *p. 478.*

SAME.—*Street Improvements.—Constitutional Law.*—Each parcel of contributing property in a taxing district may be assessed for street improvements only to the extent that it actually receives special benefits. *p. 478.*

SAME.—*Street Improvements.—Constitutional Law.*—The taxing district as a whole may be assessed for street improvements only to the extent of the sum of the special benefits actually received by the several parcels of contributing property. *p. 478.*

SAME.—*Street Improvements.—Constitutional Law.*—A street improvement, so far as its cost exceeds the special benefits resulting to the several parcels of property in the taxing district, is a benefit to the municipality at large, and such excess must be borne by the general treasury. *p. 478.*

SAME.—*Street Improvements.—Constitutional Law.*—Property owners affected by a street improvement within a taxing district are entitled to a hearing on the question of special benefits. *p. 478.*

SAME.—*Street Improvements.—Assessments.*—Section 4290 Burns 1894 provides a rule of *prima facie* assessments in street and alley improvements, which assessments are subject to review and alteration by the common council under the provisions of §4294 upon the basis of special benefits received from the improvement, and common councils not only have the power, but it is their imperative duty to adjust the assessments to conform to the actual special benefits accruing to each of the abutting property owners. *pp. 478-491.*

SAME.—*Street Improvements.—When Assessments Exceed Benefits.*—Where in adjusting assessments for street improvements it is found

154 467
154 654
f154 696
154 697
f155 240
155 241
155 242
155 244
155 253
155 255
155 257
155 405
155 406
155 607
f156 704

154 467
157 155
157 156
157 157
157 207
157 208
157 395
157 396
157 397
157 403

154 467
188US517

154 467
160 8
160 24
160 57
160 379

154 467
161 376
162 60
162 173
e162 510
162 514
162 515
162 670

154 467
163 210
163 602
163 604
d163 605
o163 606

154 467
164 559

154 467
167 67
168 425
168 426
168 428

that the total cost of the improvement exceeds the total sum of special benefits accruing therefrom the deficit must be provided from the general revenues of the city under §4292 Burns 1894. *pp. 491-493.*

MUNICIPAL CORPORATION.—*Street Improvements.*—A street improvement resolution requiring the space between the sidewalk and curb to be graded with rich dirt and sodded at the expense of the abutting property owners is void. *pp. 493-495.*

INJUNCTION.—*Street Improvements.—Resolution.—Void in Part.*— Where part of a street improvement resolution is void as being *ultra vires,* an injunction should be granted against so much of the proposed improvement as is illegal. *p. 495.*

From the Shelby Circuit Court. *Reversed.*

*T. B. Adams, Isaac Carter, B. F. Love* and *H. C. Morrison,* for appellant.

*D. L. Wilson, W. A. Yarling, A. E. Lisher, J. Chez, B. K. Elliott, W. F. Elliott, F. L. Littleton, Nelson & Myers* and *McConnell & Jenkines,* for appellee.

HADLEY, C. J.—Appellant brought this suit to restrain appellee from improving a street on which he owned an abutting lot.

Shelbyville has less than 10,000 inhabitants, and the proceedings for the proposed improvement were instituted under the statute commonly known as "the Barrett law", §§4288-4298 Burns 1894, §§6771-6780 R. S. 1881 and Horner 1897. On August 2, 1898, the common council, without any petition from the owners of the property affected, passed a resolution declaring a necessity for the improvement, the same to be executed as follows: "There shall be set and erected a curb of oolitic stone four inches thick, twenty inches wide, and not less than five feet in length, to be set twenty-two feet from the lot line outward, set to grade, set on a good bed of sand four inches thick, and to be dressed so that when set and completed the part of curbing that is exposed will show as dressed; the joints all to fit neat and smooth and make close connection; and the space between the brick sidewalk on said part of said street shall be filled with good rich dirt, and properly graded and made smooth, and when grade is made to be covered with good

live fresh sod, to be on grade with the curbing and the brick sidewalk, * * * and that the cost and expense thereof, including advertising, labor, and material for the same, be assessed against the property on the line, and collected according to the provisions of an act of the General Assembly of the State of Indiana approved March 8, 1889, and amendments thereto", and that notice should be given by publication that. the common council, on August 30, 1898, at their chamber, would receive sealed proposals for the execution of the work, and would hear property owners' objections to the necessity for the construction thereof.

On August 26, 1898, appellant filed his complaint stating the foregoing facts, and alleging that the street to be improved is 100 feet wide, and the proposed widening of the sidewalks to twenty-two feet on each side will reduce the roadway to about fifty-five feet; that the making of said improvement will cost about $1 per lineal foot, which it is proposed the abutting property owners shall pay; that it will inconvenience the plaintiff and other property owners, and make their property less valuable because of the inconvenience in getting to and from the traveled roadway; that it will be of no benefit to the plaintiff, and damage him $100. The sustaining of a demurrer to the complaint for want of facts is the only error assigned.

Counsel, in the introduction of their respective briefs, epigrammatically state the principal issue in this court thus: "Is the 'Barrett law' law?" "The 'Barrett law' is law." "The 'Barrett law' is not law."

We will not stop now to inquire whether the demurrer to the complaint should have been overruled for a minor cause, since the appellant, as indicated by his argument, has based his appeal principally upon the question of the statute's constitutionality; and for the present the complaint will be taken as admitting that the city intends to proceed in accordance with the provisions of the statute. Appellant's contention is that the statute, in violation of the federal and

State Constitutions, provides for the taking of property without just compensation, and without due process of law. Two propositions are involved: (1) Is the method of assessing the whole cost of a street improvement upon the abutting property equally by the frontage, irrespective of accruing benefits and damages, constitutional? (2) Is that the method required by the Barrett law?

Many of the courts of this country have answered the first question in the affirmative. Cooley on Taxation (2nd ed. 1886), p. 644, says: "In many instances where streets were to be opened or improved, sewers constructed, water pipes laid, or other improvements entered upon, the benefits of which might be expected to diffuse themselves along the line of the improvement in a degree bearing some proportion to the frontage, the legislature has deemed it right and proper to take the line of frontage as the most practicable and reasonable measure of probable benefits; and making that the standard, to apportion the benefits accordingly. Such a measure of apportionment seems at first blush to be perfectly arbitrary, and likely to operate in some cases with great injustice; but it can not be denied that in the case of some improvements, frontage is a very reasonable measure of benefits; much more just than value could be; and perhaps approaching equality as nearly as any estimate of benefits made by the judgment of men. However this may be, the authorities are well united in the conclusion that frontage may lawfully be made the basis of apportionment."

In his treatise on municipal corporations, published in 1890, Dillon gives an extended review of the subject, and notes that the courts are very generally agreed that the authority to require property specially benefited to bear the expense of local improvements is embraced within the taxing power, and that a statute authorizing municipal authorities to make such improvements and assess the cost in proportion to the frontage, in the absence of some special constitutional restriction, is a valid exercise of the power of taxation, and

according to the weight of authority is considered to be a question of legislative expediency.    §§752-761 (4th .ed.). And, as upholding the doctrine of the majority, the author notes (§760) that the Supreme Court of the United States holds that state laws imposing upon property, according to legislative discretion, the cost of local improvements, do not deprive the owner of his property without due process of law within the meaning of the fourteenth amendment. *Davidson* v. *City of New Orleans* (1877), 96 U. S. 97, 104, 24 L. ed. 616; *County of Mobile* v. *Kimball* (1880), 102 U. S. 691, 26 L. ed. 238; *Hagar* v. *Reclamation District* (1883), 111 U. S. 701, 4 Sup. Ct. 663, 28 L. ed. 569; *Wurts* v. *Hoagland* (1884), 114 U. S. 606, 5 Sup. Ct. 1086, 29 L. ed. 229; *Walston* v. *Nevin* (1888), 128 U. S. 578, 9 Sup. Ct. 192, 32 L. ed. 544.    To which may be added: *Spencer* v. *Merchant* (1887), 125 U. S. 345, 8 Sup. Ct. 921, 31 L. ed. 763; *Williams* v. *Eggleston* (1898), 170 U. S. 304, 311, 18 Sup. Ct. 617, 42 L. ed. 1047; *Parsons* v. *District of Columbia* (1898), 170 U. S. 45, 18 Sup. Ct. 521, 42 L. ed. 943.

The author, however, after considering many cases *pro* and *con*, and summing up the general principles underlying special assessment, in his eighth conclusion (§761), affirms what he conceives to be the only true rule upon principle as follows:    "Whether it is competent for the legislature to declare that no part of the expense of a local improvement of a public nature shall be borne by a general tax, and that the whole of it shall be assessed upon the abutting property and other property in the vicinity of the improvement, thus for itself conclusively determining, not only that such property is specially benefited, but that it *is* thus benefited to the extent of the cost of the improvement, and then to provide for the apportionment of the amount by an estimate to be made by designated boards or officers, or by frontage or superficial area, is a question upon which the courts are not agreed.    Almost all of the earlier cases asserted that the

legislative discretion in the apportionment of public burdens extended this far, and such legislation is still upheld in most of the states. But since the period when express provisions have been made in many of the state constitutions, requiring *uniformity and equality of taxation,* several courts of great respectability, either by force of this requirement or in the spirit of it, and perceiving that *special benefits actually received* by each parcel of contributing property was the only principle upon which such assessments can justly rest, and that any other rule is unequal, oppressive, and arbitrary, have denied the unlimited scope of legislative discretion and power, and asserted what must upon principle be regarded as the just and reasonable doctrine, that the cost of a local improvement can be assessed upon particular property only to the extent that it is specially and peculiarly benefited; and since the excess beyond that is a benefit to the municipality at large, it must be borne by the general treasury."

Among the many cases cited by the author in support of his conclusion is *Tide-water Co.* v. *Coster,* 18 N. J. Eq. 518, where it is said on page 527: "Where lands are improved by legislative action, on the ground of public utility, the cost of such improvement, it has been frequently held, may, to a certain degree, be imposed on the parties who, in consequence of owning lands in the vicinity of such improvement, receive a peculiar advantage. By the operation of such a system, it is not considered that the property of the individual, or any part of it, is taken from him for the public use, because he is compensated in the enhanced value of such property. But it is clear this principle is only applicable when the benefit is commensurate to the burthen; when that which is received by the landowner is equal or superior in value to the sum exacted; for if the sum exacted be in excess, then to that extent, most incontestably, private property is assumed by the public. Nor, as to this excess, can it be successfully maintained that such imposition is legitimate as an exercise of the power of taxation. Such

an imposition has none of the essential characteristics of a tax. We are to bear in mind that this projected improvement is to be regarded as one in which the public has an interest; the owners of these waste lands have a special concern in such improvement, so far as their lands will be in a peculiar manner benefited; beyond this, their situation is the same as that of the rest of the community. The consideration for the excess of the cost of the improvement over the enhancement of the property, within the operation of this act, is the public benefit: how, then, upon any principle of taxation, can this portion of the expense be thrown exclusively upon certain individuals? The expenditure of this portion of the cost of the work can only be justified on the ground of benefit to the public. I am aware of no principle which will permit the expenses incurred in conferring such benefit upon the public, to be laid in the form of a tax upon certain persons, who are designated, not indeed by name, but by their description as the owners of certain lands."

In the recent case of *Norwood* v. *Baker*, 172 U. S. 269, 19 Sup. Ct. 187, 43 L. ed. 443, filed December 12, 1898, the Supreme Court of the United States seems to have abandoned its former rulings and to have adopted what Dillon announces as the only true rule upon principle. In that case the court said: "The particular question presented for consideration involves the validity of an ordinance of that village [Norwood] assessing upon the appellee's land abutting on each side of the new street an amount covering not simply a sum equal to that paid for the land taken for the street, but, in addition, the costs and expenses connected with the condemnation proceedings"; and "the present appeal was prosecuted directly to this court, because the case involved the construction and application of the Constitution of the United States."

Under a statute of Ohio the council was authorized to assess the cost and expenses of street improvement "by the

Adams *v.* City of Shelbyville.

front foot of the property bounding and abutting upon the improvement. Under this statute the village passed an ordinance providing that all costs and expenses of the condemnation and opening proceedings should be assessed 'per front foot upon the property bounding and abutting on that part of Ivenhoe avenue as condemned and appropriated herein' ".

The real question presented by the facts is thus stated by the court: "Does the exclusion of benefits from the estimate of compensation to be made for the property actually taken for public use authorize the public to charge upon the abutting property the sum paid for it, together with the entire costs incurred in the condemnation proceedings, irrespective of the question whether the property was benefited by the opening of the street?"

In answering the question the court say: "The power of the legislature in these matters is not unlimited. There is a point beyond which the legislative department, even when exerting the power of taxation, may not go consistently with the citizen's right of property. As already indicated, the principle underlying special assessments to meet the cost of public improvements is that the property upon which they are imposed is peculiarly benefited, and therefore the owners do not, in fact, pay anything in excess of what they receive by reason of such improvement. But the guaranties for the protection of private property would be seriously impaired, if it were established as a rule of constitutional law, that the imposition by the legislature upon particular private property of the entire cost of a public improvement, irrespective of any peculiar benefits accruing to the owner from such improvement, could not be questioned by him in the courts of the country. It is one thing for the legislature to prescribe it as a *general* rule that property abutting on a street opened by the public shall be deemed to have been specially benefited by such improvement, and therefore should specially contribute to the cost incurred by the public. It is quite a different thing to lay it down as an absolute rule that

such property, whether it is in fact benefited or not by the opening of the street, may be assessed by the front foot for a fixed sum representing the whole cost of the improvement, and without any right in the property owner to show, when an assessment of that kind is made or is about to be made, that the sum so fixed is in excess of the benefits received. In our judgment, the exaction from the owner of private property of the cost of a public improvement, in substantial excess of the special benefits accruing to him, is, *to the extent of such excess,* a taking, under the guise of taxation, of private property for public use without compensation."

After reviewing many authorities and iltalicizing what Dillon affirms as the true rule, the court concludes: "It thus appears that the statute authorizes a special assessment upon the bounding and abutting property by the front foot for the entire cost and expense of the improvement, without taking special benefits into account. And that was the method pursued by the village of Norwood. The corporation manifestly proceeded upon the theory that the abutting property could be made to bear the whole cost of the improvement, whether such property was benefited or not to the extent of such cost."

And further: "As the pleadings show, the village proceeded upon the theory, justified by the words of the statute, that the entire cost incurred in opening the street, including the value of the property appropriated, could, when the assessment was by the front foot, be put upon the abutting property, irrespective of special benefits. The assessment was by the front foot and for a specific sum representing such cost, and that sum could not have been reduced under the ordinance of the village even if proof had been made that the costs and expenses assessed upon the abutting property exceeded the special benefits. The assessment was in itself an illegal one because it rested upon a basis that excluded any consideration of benefits. A decree enjoining the whole assessment was therefore the only appropriate one."

Again: "The present case is one of illegal assessment under a *rule or system* which, as we have stated, violated the Constitution, in that the entire cost of the street improvement was imposed upon the abutting property, by the front foot, without any reference to special benefits."

An assessment for such improvement, to be in conformity with the opinion, is thus stated: "That while abutting property may be specially assessed on account of the expense attending the opening of a public street in front of it, such assessment must be measured or limited by the special benefits accruing to it, that is, by benefits that are not shared by the general public; and that taxation of the abutting property for any substantial excess of such expense over special benefits will, to the extent of such excess, be a taking of private property for public use without compensation."

The final judgment of the court follows: "The judgment of the circuit court must be affirmed, upon the ground that the assessment against the plaintiff's abutting property was under a rule which excluded any inquiry as to special benefits, and the necessary operation of which was, to the extent of the excess of the cost of opening the street in question over any special benefits accruing to the abutting property therefrom, to take private property for public use without compensation."

While the facts in the Norwood-Baker case are unusual, and distinguishable from the facts in the case at bar, yet it can not be successfully denied that the general doctrine laid down is to the effect that the imposition of assessments for local improvements per front foot, irrespective of the question of accruing benefits, is in violation of the fourteenth amendment to the federal Constitution; and that the case has been so construed generally by the courts of the country. See *Loeb* v. *Trustees of Columbia Tp.* (C. C. S. D. Ohio), 91 Fed. 37, January 9, 1899, involving the validity of assessments laid by a township upon abutting property for the improvement of a road; *Fay* v. *City of Springfield* (C. C.

S. D. Mo.), 94 Fed. 409, May 9, 1899, street paving assessments against abutters; *Sears* v. *Street Commissioners*, 173 Mass. 350, 53 N. E. 876, May 18, 1899, sewer assessments upon a particular class of property; *Hutcheson* v. *Storrie*, 92 Texas 685, 51 S. W. 848, 45 L. R. A. 289, June 19, 1899, street paving assessments upon abutting property; *Schroder* v. *Overman* (Ohio St.), 55 N. E. 158, October 24, 1899, street pavement and sewer assessments against abutters; *Charles* v. *City of Marion* (C. C. Dist. Ind.), 98 Fed. 166, December 11, 1899, street paving assessments against abutters.

The judgment of the federal Supreme Court defining the limits of legislative power, sanctioned by the federal Constitution, is the supreme law of the land. It commands state courts as well as state legislatures. The duty thus imposed is agreeable as being in accord with our sense of just principles, and as furnishing the only reasonable foundation for the exercise of the taxing power in respect to special assessments.

Streets are public highways which all inhabitants of the municipality have an equal right to use and by the improvement of which all are in a measure benefited. There is much justice in holding that a sum equal to the special benefits, that is, such benefits as are not shared by the citizens generally, conferred upon the abutters may be exacted for application to the costs of the improvement; for when the corporation takes only so much as it returns in the way of enhanced values and increased personal comfort, the property owner is not injured; but when he has thus contributed his special benefits as to the remainder of the costs he stands as any other citizen. This remainder represents the price to the public for its general benefits, and when exacted from the abutters is but the taxation of a class for public benefit, and clearly a taking of property for public use without just compensation.

We conclude, therefore, that the principles applicable to

assessments for local improvements are these : *The legisla-*
*ture may create, or authorize a municipality to create, a*
*local taxing district for local improvement purposes, which*
*includes part only of the property within the municipality;*
*the legislature may declare conclusively that only the prop-*
*erty within the taxing district shall be specially assessed on*
*account of local improvement within that district;* `each`
*parcel of contributing property may be assessed only to the*
*extent that it actually receives special benefits; the taxing*
*district as a whole may be assessed only to the extent of the*
*sum of the special benefits actually received by the several*
*parcels of contributing property; the improvement so far as*
*its cost exceeds the special benefits resulting to the several*
*parcels of property in the taxing district, is a benefit to the*
*municipality at large, and such excess must be borne by the*
*general treasury; property owners affected by an improve-*
*ment, within a taxing district, are entitled to a hearing on*
*the question of special benefits.*

It remains to be seen if the Barrett law denies any of these
principles.

Whether the answer shall be for the appellant or the
appellee depends upon two considerations namely: (1) Does
the Barrett law require that the costs of street and alley im-
provements shall be assessed against abutting property by
the front foot rule, without regard to the question of result-
ing benefits? (2) Do the provisions of the Barrett law
supply to affected property owners due process of law within
the meaning of the State and federal Constitutions?

In arriving at the true interpretation of the statute it is
useful for us to review the legislative and judicial history
of the State and country prior to the enactment of the Bar-
rett law in 1889.

Dillon and Cooley class Indiana as one of the majority
states upholding the doctrine that it is competent for the
legislature to conclusively declare that the total cost of a
local improvement shall be assessed equally against the
frontage; and such classification was not without warrant.
In 1852, the right to confer authority upon municipal offi-

cers so to provide for street and other improvements, was first asserted by the legislature as a general law.   R. S. 1852, p. 217.   It was reasserted in 1857 (Acts 1857, p. 53), and again in 1865 (Acts 1865, S. S. p. 29), and again in 1867 (Acts 1867, p. 66), and again approved in 1881, §3163 R. S. 1881.   The right to enforce such assessments was recognized by this court in 1861, *Indianapolis* v. *Imberry*, 17 Ind. 175, and in many subsequent decisions.   The constitutionality of such legislation was never called in question until 1868, when it was assailed on the ground only that the same was in violation of the State Constitution requiring the rate of assessment and taxation to be uniform and equal.   Such legislation was then and subsequently upheld as against such objection.   Art. 10, §1, State Constitution; *Goodrich* v. *Turnpike Co.*, 26 Ind. 119; *Bright* v. *McCullough*, 27 Ind. 223; *Palmer* v. *Stumph*, 29 Ind. 329; *Law* v. *Turnpike Co.*, 30 Ind. 77.

But the constitutional question of due process of law, and the taking of property for public use without compensation, in the making of local improvements, within the meaning of the fourteenth amendment to the federal Constitution, seems never to have been previously considered by this court, so far as we have observed.   Hence no ground exists to justify the insistence that the determination by this court, under former street improvement laws, of the constitutional question now involved, has been carried into the enactment of the statute in controversy.

It should be noted that prior to 1889 no provision was found in any of the laws entitling property owners to a voice upon the necessity for the improvement, or to a hearing of any kind upon the acts of the assessing officers, or to be heard upon any subject touching the improvement, until after the issuance of a precept for the sale of their property for the payment of the assessment, and then only as to the regularity of the proceedings subsequent to the·making of the contract for the improvement.   As the law had stood for

thirty-seven years, when the Barrett law came up for consideration in the Assembly of 1889, municipal officers had the power, with a two-thirds vote of the council, to order an improvement, however costly and however unnecessary and oppressive, without regard to the wishes of the citizens, and proceed to charge the abutters with the total cost by the frontage rule, irrespective of any consideration of benefits, and thus, in some instances, impose upon the citizen an absolute confiscation of property without any form of hearing in its defense, further than to require it to be done orderly, and according to prescribed rule. For some reasons the people had become dissatisfied with the law, as it existed, upon the subject. In what respects may be best judged from the character of the changes that were made. It is evident that the discontent did not arise from the method of frontage assessments, as a rule, for that principle had been consistently maintained in every enactment since 1852, and was carried into the Barrett law. Besides, in most cases the rule is as just and equitable as any that may be devised. In the light of thirty-seven years' experience, however, it was doubtless manifest to the lawmakers that in some instances municipal officers, by reckless and inconsiderate acts, without testing public opinion, had involved citizens in heavy and unnecessary burdens by improvements; and that it was to them equally clear that all property bordering upon a municipal highway was not affected in the same way by an improvement of the latter; that in some cases the grade may be so raised or lowered as to most seriously impair the use and value of the property; in others, that some property may be situate upon a general level, highly improved, and in a business part of the city, while others upon the same street may be remote from business, lying low, and near a watercourse, and practically worthless for business or residential purposes; in others, some abutting lots may be twenty feet, and others 200 feet, deep. It seems, therefore, reasonable to presume that the mischiefs resulting from the acts of

reckless officials, and the common but exceptional cases of injustice and hardship flowing from the uniform and rigid application of the front-foot rule, were brought to the attention of the legislature, and that their avoidance was a purpose entering into the structure of the new law. *Quill* v. *City of Indianapolis*, 124 Ind. 292, 295, 7 L. R. A. 681. This much is certain, that, for reasons deemed sufficient, new and important provisions were incorporated into the new law—provisions contained in no previous law upon the subject.

The first of these is §2 Acts 1889, p. 237, §4289 Burns 1894, and is as follows: "Whenever cities or incorporated towns subject to the provisions of this act shall deem it necessary to construct any sewer, or make any of the alley or street improvements in this act mentioned, the council or board of trustees shall declare by resolution the necessity therefor, and shall state the kind, size, location and designate the terminal points thereof, and notice for ten days of the passage of such resolution shall be given for two weeks in some newspaper of general circulation published in such city or incorporated town, if any there be, and if there be not such paper, then in some such paper printed and published in the county in which such city or incorporated town is located. Said notices shall state the time and place, when and where the property owners along the line of said proposed improvement can make objections to the necessity for the construction thereof."

It is argued that this section affords the property owner no remedy beyond the right to advise the council with respect to the necessity for the improvement; and so it has been held by this court. *Quill* v. *City of Indianapolis*, 124 Ind. 292, 7 L. R. A. 681. But it does not follow that no benefit is to flow to the property owner from the observance of this provision. Municipal officers are elective, and, as a rule, in dealing with corporation affairs, will give respectful heed to the popular judgment of their constituents. This

provision removes all power from the common council to impose burdens upon private property unawares the owner. It requires public notice to be given of the character and location of the proposed improvement for twenty-four days from the first publication, a length of time sufficient to develop public opinion advisedly, and at a fixed time and place, and before making a contract, the council shall hear those along the line upon the subject of the improvement; and it may reasonably be expected that if the property owners shall be able to show that there exists no necessity for such improvement, or that it will cost more than the accruing benefits, well meaning officers will be controlled by such showing and advice, as readily as by the positive mandate of a statute. It was not intended by this section to deprive the common council of the power of ordering the improvement irrespective of the advice of the property owners, but its purpose is to provide, in all cases, that they shall act advisedly and with deliberation.

The second and most important new provision is found in sections six and seven, Acts 1889 (the latter section, as amended, Acts 1891, p. 324, Acts 1899, p. 63), sections 4293, 4294 Burns 1894, which follow:

Section 4293. "When any such improvement has been made and completed according to the terms of the contract therefor made, the common council of such city, or the board of trustees of such town, shall cause a final estimate of the total cost thereof to be made by the city or town engineer, and the common council of such city, or the board of trustees of such town shall require said city or town engineer to report to the common council of such city or the board of trustees of such town the following facts touching such improvement: *First.* The total cost of said improvement. *Second.* The average cost per running front foot of the whole length of that part of the street or alley so improved. *Third.* The name of each property owner on that part of the street or alley so improved. *Fourth.* The number of front feet

owned by the respective property owners on that part of said street so improved. *Fifth.* The amount of such cost for improvement due upon each lot or parcel of ground bordering on said street or alley, which amount shall be ascertained and fixed by multiplying the average cost price per running front foot by the number of running front feet of the several lots or parcels of ground respectively. *Sixth.* The full description, together with the owner's name, of each lot or parcel of ground bordering on said street so improved. *Seventh.* In the case of the construction of a sewer, a description of each lot or parcel of lot benefited thereby, together with the owner's name and the fair proportion of the cost of such sewer according to the benefits conferred thereby, that should be assessed against such lot or part of a lot.

"Upon the filing of the report provided for in the last preceding section, the common council of such city, or the board of trustees of such town, shall give two weeks' notice in a newspaper printed and published in such city or incorporated town, if any there be, and if there be no such paper, then in a newspaper printed and published in the county in which such city or incorporated town is located, of the time and place, when and where, a hearing can be had upon such report, before a committee to be appointed to consider such reports, and such committee shall make report to the common council of such city, or the board of trustees of such town, recommending the adoption or alteration of such report, and the common council of such city or the board of trustees of such town may adopt, alter or amend such report and the assessments therein. Any person feeling aggrieved by such report shall have the right to appear before such committees and the common council of such city or the board of trustees of such town, and make objection thereto, and shall be accorded a hearing thereon, and the common council of such city, or the board of trustees of such town, shall assess against the several lots or parcels of ground the sev-

eral amounts which shall be assessed for and on account of such improvement."

It will be noted that section six provides that after completion of the work the engineer shall report certain facts to the council—not make an assessment of the costs; that when such report is lodged with the council it shall give two weeks' public notice of a time and place, when and where a *hearing* can be had upon the facts reported by the engineer, before a committee appointed by the council to *consider* such report, and such committee shall, after a consideration of the report, recommend to the council the adoption or alteration of the same. And any person feeling aggrieved by such report shall have the right to appear before the committee and *present objections* thereto, *and shall be accorded a hearing thereon,* and the further right to carry his objections to the common council where he shall also be accorded a hearing. After the hearings and objections are disposed of, the common council may adopt, alter, or amend the report and the assessments thereon, "and shall assess against the several lots or parcels of ground the several amounts which shall be assessed for and on account of such improvement."

It is contended that the statute limits the hearing before the committee and common council to errors of the engineer in stating the facts required of him, and that the power of the council, with respect to the report, is exhausted when it has verified such facts. We are unable to approve such construction. Section six requires that the engineer shall report certain facts to the council; that is to say, report such facts *correctly;* nothing short of a correct report is a compliance with the statute. We must view the subject as if the lawmakers assumed that the engineer would do his duty and that when he submitted his report to the council it accurately stated the facts required of him. Besides, will it be seriously contended that if, by inadvertence, errors crept into the report, the engineer, or even the council, at any time before

final action thereon, did not have full power to correct it? *Ball* v. *Balfe*, 41 Ind. 221, 225. What reason, then, could there be for the legislature to deem it expedient to provide express authority in the council to correct, or cause to be corrected, errors in a report where none were reasonably supposed to exist, and where the power of correction would exist by irresistible implication? We may not attribute insincerity and dissembling to the legislators. We must believe that they meant something by these provisions beyond that granted by the old law, or why change it? The old law had been found efficient and authorized by the Constitution.

In the search for legislative intent "the court will look to each and every part of the statute; to the circumstances under which it was enacted; to the old law upon the subject, if any; to other statutes upon the same subject, or relative subjects, whether in force or repealed; to contemporaneous legislative history, and to the evils and mischiefs to be remedied." *Barber, etc., Co.* v. *Edgerton*, 125 Ind. 455, 460; *Reynolds* v. *Bowen*, 138 Ind. 434, 449; *Goodwin* v. *State*, 142 Ind. 117, 121.

The common council shall give two weeks' notice of a time and place when their committee shall consider the report and hear grievances. In drainage and other assessment proceedings, it is provided that the commissioners shall inquire into certain facts, assess benefits and damages, and "make report to the court; and the court shall fix a time for *hearing the report*", and, after ten days' notice of the filing thereof, those affected by the report may appear and remonstrate. §§5624, 5625 Burns 1894.

It is even doubtful that the consideration of the report required of the committee, and the hearing they shall give thereon, relate to any other subject than the *proposed* assessments, or allotments of the cost of the improvement? After such hearing and consideration the committee is required to report their recommendations to the common council, and

the council, being thus advised, and upon further hearing
of objections, may adopt the report as made by the engineer,
distributing the total cost equally per front foot, or it may
alter the report and the assessments therein; and when the
conclusion of the council is reached, it shall assess against
the several lots and parcels of ground the several amounts
which shall be assessed on account of such improvement.
The mandate of the statute, following the hearings, that the
council shall assess the several amounts against the several
parcels, clearly indicates the particular subject to be pre-
viously considered by the council and its committee. From
the term "hearing" is necessarily implied the power to ad-
minister some adequate remedy.

The council may alter the assessments, that is, as indicated
by the engineer's report on the front-foot rule. "Alter" is
to "make otherwise". Webster's Int. Dict.

From these considerations we are unable to resist the con-
clusion that, upon the hearing provided in section seven, the
common council have power to change assessments from the
frontage rule in such cases as they may deem just. That the
legislature may confer upon municipal officers the power to
adjust special benefits accruing from such improvements to
a fair and just basis, is well settled; *Garvin* v. *Daussman,*
114 Ind. 429, 435; *Kizer* v. *Town of Winchester,* 141 Ind.
694, 696; and the speedy and ample remedy afforded by this
view of the statute is consistent with the spirit of the act and
the nature of such improvement, which public convenience
requires to be accomplished in the shortest practical period,
as said in *Garvin* v. *Daussman, supra,* page 436: "It is
essential to the public good that the necessity for street and
other public improvements, and the cost of making them,
and such other proceedings as are necessary to insure the
prompt execution of the work, be determined and taken in
a comparatively summary way."

An assessment is the "adjusting of the shares of a contri-
bution by several towards a common beneficial object accord-

ing to the benefit received". Bouvier's Law Dict.; Anderson's Law Dict.

From the power to alter is necessarily implied the power to add to or diminish. The absence of an express rule for guidance in the exercise of the power to alter does not impair it. It is sufficient if the power to change the assessment from the frontage rule exists. "It is a well affirmed principle that where a power is conferred by a statute, everything necessary to carry out the purpose of the power conferred and make it effectual and complete will be implied." *Conn v. Board*, etc., 151 Ind. 517, 525; Sutherland's Stat. Con. §§340 and 341. Such implied power, however, will not authorize the employment of means and methods which may spring from the whims and caprices of administrative officers, according to varying circumstances, but will only permit the use of such reasonable, uniform, and consistent modes and measures as are calculated to accomplish the purpose in the spirit designed. How the power may be exercised in this instance must be determined from the spirit and scope of the whole act, of which said section seven is a part, as aided by the spirit, and principle running through other legislation upon the same and kindred subjects. Sutherland's Stat. Con. §288.

In an act relating to the opening and improvement of streets, §3633 Burns 1894, §3170 R. S. 1881 and Horner 1897, commissioners are commanded to make assessments on the basis of actual benefits. The same rule is required in drainage and free gravel road proceedings, §5658 Burns 1894, §4288 R. S. 1881 and Horner 1897, Acts 1869, p. 74. And this court has consistently held for thirty years that special benefits are the only foundation for special assessments. *City of New Albany* v. *Cook*, 29 Ind. 220; *Ross* v. *Stackhouse*, 114 Ind. 200; *Quill* v. *City of Indianapolis*, 124 Ind. 292, 7 L. R. A. 681; *Barber*, etc., *Co.* v. *Edgerton*, 125 Ind. 455, 465.

The published notice calls attention of all persons affected

that the report of the engineer is before the council for consideration, and that the same is subject to such alteration as the council may deem just in adjusting the several assessments to the basis of actual benefits, and all persons concerned are bound to know that the *prima facie* assessments against their property are liable to be increased as well as decreased. That this court prior to 1889 supported the doctrine that the legislature had constitutional sanction to declare, as matter of law, that the special benefits to a particular district, by an improvement, were equally received by bordering property, and equal to the total cost, has little force as an argument. The answer to it is that the injustice and hardship resulting from the doctrine were potential in securing legislative action for the amelioration of the rule. We think it evident that the Assembly of 1889 determined upon a modification of the old rule, so far as it required an equal distribution of the cost of an improvement on all bordering property, without regard to the question of actual benefits. Not that the rule offended either the federal or State Constitution as then interpreted by the federal and State courts (for no question of that character had been raised in this State), but because it was required by the simplest principles of justice. The act of 1889 must be tested by the usual canons of construction, and if from these it appears that the Assembly took cognizance of the mischiefs resulting from the old law and provided a remedy in advance of constitutional requirement, the legislation is not to be discredited by the fact that the courts have come to restrict the constitutional limitations to the bounds set by the statute. The important inquiry is: Is the statute, as enacted in 1889, and as it now stands, antagonistic to any of the principles of the federal Constitution as now construed by the United States Supreme Court.

Section 3 (§4290 Burns 1894, §6773 Horner 1897) provides: "In all contracts specified in the preceding section the cost of any street or alley improvement shall be esti-

mated [not assessed] according to the whole length of the street or alley, or the part thereof to be improved per running foot  *  *  *  and the city or incorporated town shall be liable to the contractor for the contract price of said improvement, and the owners of lots or parts of lots bordering on such street or alley, or the part thereof to be improved,  *  *  *  shall be liable to the city for their proportion of the costs in the ratio of the front line of their lots owned by them, to the whole improved line for street and alley improvements,  *  *  *  and the city or incorporated town shall have a lien upon such lots or parts of lots, respectively, from the time such improvement is ordered, for such costs of improvement, collectible as hereinafter provided  *  *  *.  Such city or town shall be liable and pay for all that part of such street or alley improvement as shall be occupied by the street and alley crossings, and may order that any part of the total cost of any of the improvement in this act mentioned shall be paid out of the general fund."

The gist of these provisions is that in providing for the payment for an improvement, the expense of it shall be estimated, that is calculated, by the running foot; the city or town shall be liable to the contractor for the full contract price, and, to reimburse it, the owners of lots shall be liable to the city or town for their legal proportion of the cost, in the ratio of their several frontage to the whole frontage of the improvement; which liability shall constitute a lien upon abutting property in favor of the city or town from the time such improvement is ordered.

Three things may be noted in these provisions:  (1) That the cost shall be *estimated* by the running foot, not so assessed; (2) that the liability shall relate to the frontage; and (3) that the liability and lien shall arise and attach at the time the improvement is ordered.  There is nowhere to be found a mandate that the costs shall be *assessed* by the frontage rule or that property shall ultimately be required to contribute equally per front foot.  The measure of liability

and lien here mentioned is only conjectural at most, since they arise before an ascertainment of the facts, by measurement, necessary to their definite determination. The provision can only mean that the liability and lien, when definitely ascertained by the report of the engineer, as required by section six, as reviewed and adjudged by the common council, as required by section seven shall relate back to the time of ordering the improvement.

If we read section three as providing a fixed rule of assessments as contended, the effect is to render section seven meaningless and nugatory; for it clearly follows that if the rule of assessments is unalterably fixed by section three, the hearing provided for in section seven is nothing more than a cunningly devised illusion which expressly provides that the aggrieved property owners shall have the right to present their grievance to a tribunal that has no power to grant relief. This is mockery pure and simple, and implies insincerity and dissimulation in the lawmakers, which we can not indulge.

On the other hand, if we read section three as providing a basis for assessments which shall be *prima facie* correct, and which shall be held to be the true and correct assessments until assailed by the property owner, and shown upon a hearing, by a preponderance of proof, to be incorrect, or found to be unjust and altered and amended by the common council of its own motion, then we find sections three, six and seven in complete harmony, each effective, and in accord with the other provisions of the act. The intention is to be ascertained by considering the entire statute; and we must proceed as we would with any other composition, construing it with reference to the leading idea and purpose of the whole instrument. The general intent is the polar star by which the meaning of any part is to be determined with a view to harmonizing the entire act. Sutherland's Stat. Con. §239.

We therefore conclude that section three, acts 1889 (§4290 Burns 1894) must be construed as providing a rule

of *prima facie* assessments in street and alley improvements, which allotments by the city or town engineer, under section six of said act of 1889 (§4293 Burns 1894), are subject to review and alteration by the common council and board of trustees, under section seven of said act of 1889, as amended (Acts of 1891, p. 324, Acts 1899, p. 64, §4294 Burns 1894), upon the basis of actual special benefits received by the improvement; and that under said section seven, the common council of a city, or board of trustees of an incorporated town, have not only the power, but it is their imperative duty, to adjust the assessments for street and alley improvements, under said act, to conform to the actual special benefits accruing to each of the abutting property owners.

The further question is propounded: If, in adjusting assessments to actual special benefits received, it shall be found that the total cost of the improvement exceeds the total sum of special benefits accruing therefrom, what provision is made for the excess of cost? It is quite clear that the common council or board of trustees have no power to impair the obligation of contracts, and that some provision must be made for full payment of the contract price for the improvement.

Section five of said act (§4292 Burns 1894) reads as follows: " * * * The common council of such city or the board of trustees of such town, with the concurrence of two-thirds of the members thereof, may order or cause any or all of the improvements mentioned in the first section of this act, and repairs of any kind of streets and alleys to be made in like manner, without such petition, and either charge and cause any or all of the expenses thereof to be assessed and collected as hereinafter provided, when petition is made, or if it is deemed just and right by the common council of such city or the board of trustees of such town, to cause such expenses, or any part thereof, to be paid out of the general revenue of the city or incorporated town."

Here is a new power granted the common council and

board of trustees to order, by a two-thirds vote, any improvement, as fully as they could do upon a petition, as provided by section one; and when the body chooses to exercise this power, it may elect among three schemes, in providing payment for street and alley improvements. It may either charge the whole expense against the general revenues of the city or town, or it may charge a part against the general revenues and a part against the abutting property, or it may charge all the expenses of such improvement against the abutting property, upon the presumption, which it may for the time indulge, that the aggregate special benefits accruing therefrom will be equal to the total expenses; but it must take notice, when it decides to charge the abutting property, that the expenses shall be assessed "as hereinafter provided" in sections six and seven, which, as we have seen, must be done upon the basis of actual special benefits received.

Section three (§4290 Burns 1894) provides that "the city or incorporated town shall be liable to the contractor for the contract price of said improvement," and when a city or town enters into a contract, under the scheme of requiring the abutters to contribute to the cost to the extent of their special benefits, the corporation is bound to know that if it shall be found, upon the hearing provided in section seven, that the accruing special benefits are inadequate to pay the expenses of the improvement, the deficit must be provided for from the general revenues of the city or town. The question of deficit can not be determined until the common council has concluded its hearings and made the assessments. At this stage, the improvement has been completed and the contractor entitled to his pay. It is then too late to halt or retreat. No course is then open to the corporation but to go forward and put into exercise the power conferred by section three and order the deficit paid from the general treasury.

The contingency of a deficit arises from the law, and enters into and becomes a part of the order for the improve-

ment and a part of the contract therefor, and is but a reasonable exercise of the continuing power to pay any part of the expenses from the general revenues when the fact arises that they can not be fully met by the special benefits. The entering into a contract under the scheme of requiring contribution from special benefits to the extent thereof, is an election between methods of payment, and, when once chosen and entered upon, the procedure thereunder, as fixed by the law, is as imperatively commanded as if no other existed. The insistence, therefore, that the law contains no mandate that the common council or board of trustees shall, in any event, pay any part of the expenses of such improvements, from the general revenues, can not be sustained.

We are aware that this court has held that when the assessment scheme is pursued in making such improvements, the city or town assumes no primary liability, except for street and alley crossings; and what we here hold is that, as to a deficit only, if any, in special benefits, to meet the costs of an improvement, the city or town sustains the same primary obligation imposed upon it for street and alley crossings.

There is language used in *City of Terre Haute* v. *Mack*, 139 Ind. 99, and perhaps in other cases in this and the Appellate Court, not necessary to the decision of any question presented by the record, that appears in conflict with what is here decided, but, in so far as such language may so appear, it is disapproved. The canons of construction compel the interpretation which we have given this act, and so construed it is not obnoxious to any provision of the State or federal Constitution, either under the Norwood-Baker case or the earlier decisions of the Supreme Court of the United States or of this State.

It is proposed by the improvement which affects the appellant to reduce the roadway of the street from seventy to fifty-six feet in width by an extension outward of the sidewalks from fifteen to twenty-two feet. The sidewalks have

heretofore, under corporation direction, been improved to a width of fifteen feet from the lot lines, the first ten feet paved with brick, and the balance to the curb graded and sodded; and it will be noted from the facts stated on the first page of this opinion that a part of the proposed improvement consists of filling the space between the brick sidewalk and the new curb with "good rich dirt", to be smoothed to a grade with the brick sidewalk and new curb, and covered "with good, live, fresh sod."

The point is made that, conceding the constitutionality of the Barrett law, the ordinance is void for want of power in the common council, under the statute, to assess the cost of filling with rich dirt and sodding against the abutters.   The first section of the act (§4288 Burns 1894) provides that the common council may "have the sidewalks graded and paved, or the whole width of the street graded and paved" under the provisions of the act.   It may well be doubted if the authority here conferred can be extended to grading with a particular quality of earth, designed not for the permanency of the improvement but to produce a luxuriant vegetable growth.   We think the words "grading and paving" are employed in the statute in the sense that the surface of the ground shall be made to conform to a regular line by cutting and filling with any sort of dirt suitable to the maintenance of the grade, and which may be most cheaply obtained, and smoothly covering the same with some hard substance, with the single view to permanency and easy travel for footmen and vehicles.

It is probably true, though we do not so decide, that the common council, in their general dominion over the streets, have implied power to construct lawns, and otherwise decorate those parts of the street not necessary to public travel, at the expense of the general treasury, but when it seeks to exercise the taxing power, and to levy upon a particular class the cost of an improvement, purely ornamental, it must be able to point to some express provision of the statute con-

ferring the right; no power to tax will arise by implication. *Doe* v. *Chunn*, 1 Blackf. 337, 338; *City of Lafayette* v. *Cox*, 5 Ind. 38; *Slessman* v. *Crozier*, 80 Ind. 487; *Gallup* v. *Schmidt, ante*, 196.

The council has express authority of law to require the planting of shade trees at the expense of the abutters (§3541 Burns 1894, §3106 Horner 1897, cl. 46) but it can not be said that this right carries with it the power to construct lawns or other decorations in the streets, and to enforce the cost thereof against the abutters. The power is at least doubtful, "and any fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation and the power denied". Dillon's Mun. Corp. (4th ed.), §89, approved: *City of Crawfordsville* v. *Braden*, 130 Ind. 149, 152, 14 L. R. A. 268; *Williams* v. *Davidson*, 43 Tex. 1, 33; *City of Corvallis* v. *Carlile*, 10 Ore. 139; *Kirkham* v. *Russell*, 76 Va. 956.

We therefore hold that the ordinance, so far as it provided for the grading with rich dirt and sodding, as a part of the proposed improvement, was void as being *ultra vires*, and that the appellant was entitled to an injunction against so much of said proposed improvement. Equity will enjoin the exercise of an unauthorized power. *Sackett* v. *City of New Albany*, 88 Ind. 473, 45 Am. Rep. 467; *Board, etc.*, v. *Gillies*, 138 Ind. 667, 673; Dillon Mun. Corp. (4th ed.), §914.

If entitled to any part of the relief sought, the demurrer to the complaint should have been overruled.

Judgment reversed, with instructions to overrule the demurrer to the complaint.

Baker, J., dissents from so much of the opinion as affirms the constitutionality of the Barrett law.

### DISSENTING OPINION.

BAKER, J.—I regret my inability to agree with my brethren in their construction of the Barrett law. In stating my

reasons, with all due deference, I think it proper first to determine accurately the question presented for solution. The federal Constitution is not what the citizen may read it to be, but is what the Supreme Court of the United States declares it to be. I concur in the statement that, prior to the *Norwood* v. *Baker* decision, 172 U. S. 269, 19 Sup. Ct. 187, 42 L. ed. 443, the method stated in §752 of Dillon was constitutional, that is, that the legislature in its discretion might declare *as a matter of law* that the whole cost of a street improvement and the special benefits to abutting property equaled each other, and that the cost should be apportioned according to frontage, and that the property owners were entitled to a hearing before a tribunal authorized to review the assessment and see that it justly conformed to the frontage basis. For brevity, I shall call this the "old" constitution. I concur in the statement that, since the Norwood-Baker decision, the method stated in §752 of Dillon is unconstitutional, and that nothing short of the method stated in §761 of Dillon is constitutional, that is, that the legislature must provide a method by which the special benefits to contributing property shall be determined *as a question of fact*, and that the excess of cost above the sum of special benefits is a general benefit to be paid for from the general treasury, and that property owners are entitled to a hearing before a tribunal authorized to review the assessment and see that it justly conforms to the basis of benefits in fact received. For brevity, I shall call this the "new" constitution. The text-books and reports are full of the general statement that "the only basis for special assessments is special benefits". Concerning this proposition there has never been any disagreement, so far as I have been able to learn. But from this common starting point, two very dissimilar lines of thought have been followed. In one, it was said: "Special benefits are the only legitimate basis for special assessments, but the legislature may declare as a matter of law that the property owner's special benefits are

exactly equal to his special assessment by frontage". In the other, it was said: "Special benefits are the only legitimate basis for special assessments, but the property owner may not be specially assessed beyond his special benefits found as a matter of fact." So, finding in reported cases the expression that special benefits are the only legitimate basis for special assessments does not of itself show which theory a court has adopted. It is hardly conceivable that a court would be following out the two theories at the same time. They seem as far apart as the poles, as essentially different as a question of law is from a question of fact. A legislative act, it seems to me, must have some consistent theory underlying it. It can not well be two different things at once. The legislature must have intended the one or the other,—not both. And, though it is within the range of possibilities that the legislature in 1889 might have framed a law which would meet the requirements of the "new" constitution of 1898 and which would be permissible under the "old", the question is: Which theory was it that the legislature intended to conform to in the Barrett law? Is it likely that, by prescience or by chance, the legislature hit upon the requirements of the "new" constitution that were not in the "old"? Or, on the contrary, did the legislature intend to carry out the same policy, sanctioned by the judiciary, that had been in operation for nearly forty years,— with the addition of the bond feature?

Before proceeding with the question, it may be well to notice two lines of argument advanced by counsel for appellee, to which my brethren, perhaps unconsciously, may have accorded some weight. One is, that this court must presume that the legislature intended its act to conform to the Constitution, and therefore this court by intendment should supply to the act whatever is needed to make it constitutional. The other is, that the Supreme Court of the United States will follow any line of decision that this court may adopt. Whether or not this last statement is true is not within the

province of this court to decide; and whether, if that were true, it is an argument addressed to the reason, or an appeal to what counsel may believe to be the prepossessions of this court, is not worth while to consider. But counsels' first contention is of great importance. If the contention were correct, then this court and every court has committed a grievous wrong against an independent and coördinate branch of the government every time a statute has been held to be unconstitutional. But, it seems to me, such a process is not judicial construction. Judicial construction is not an unbridled force, operating this way in one case and that way in another, according to caprice or what courts may think would be good legislative judgment. The function of judicial construction is, not to hold statutes constitutional, but to determine the meaning of statutes. If it is found that the legislature has acted within the scope of its powers, courts should let the act alone whether they deem it wise or not. If it is found that the legislature has usurped power and invaded the reserved rights of the people, it should be the duty of the courts rigorously and jealously to uphold the rights of the people, even if they think the legislature ought to have the power it attempted to exercise. The first business of the courts is to ascertain judicially the meaning of the statute. Whether the statute is constitutional or unconstitutional can not be determined until the meaning of the statute is first determined. And that meaning should be determined according to rules of law that the courts should uniformly follow. If courts recognize no rules in declaring the legislative intent, or disregard the lawful order of applying recognized rules, the people, the bar and the inferior tribunals would have no means by which to make even a fair guess at what would finally be declared to be the law. If there is no law to control courts' interpretation of law, as well might there be no law at all. *Non licet judicibus de legibus judicare, sed secundum ipsas.* But, if counsel were correct in the contention that the court

should first examine the Constitution and then by construction mold the statute to fit it, the argument, it seems to me, should operate against appellee, and not in its favor, for the Constitution that the members of the legislature of 1889 had sworn to support was the "old" constitution. They may have had the prevision to see that a "new" one was coming, but they were not bound to frame their laws according to its fashion. Yet, the impression remains with me that my brethren have first laid out the new pattern and then cut the old material to fit it.

The Barrett law is too lengthy to set out here in full. But, omitting such portions as are exhibited in the majority opinion, I shall endeavor to give the framework of the statute. The first section provides for the beginning of street improvement proceedings by the petition of property owners. The second section authorizes the common council to declare by ordinance the necessity for street improvements, and directs notice of the passage of such an ordinance to be given by publication. "Said notices shall state the time and place when and where the property owners along the line of said proposed improvement can make objections to the necessity for the construction thereof." This section does not purport to relate to the method of assessment, or to give property owners a hearing on any subject except the necessity of the proposed improvement; and, as the power to decide is left within the unqualified discretion of the council, the objections which property owners could make on the question of the necessity of the improvement would necessarily be advisory only. Accordingly, it is decided by this court that the common council may enter an order for the construction of the improvement before giving notice of the resolution of necessity. *Barber, etc., Co.* v. *Edgerton,* 125 Ind. 455, 462. This being so, I am unable to perceive how section two has any application to the construction of the sections that point out the procedure after the performance of the work has been determined upon. The third sec-

tion, omitting the part in reference to sewers, declares that "the cost of any street or alley improvement shall be estimated according to the whole length of the street or alley, or the part thereof to be improved, *per running foot,* * * * and the city or incorporated town shall be liable to the contractor for the contract price of said improvement, and the *owners of lots* or parts of lots bordering on such street or alley, or the part thereof to be improved, * * * *shall be liable* to the city for their proportion of the costs *in the ratio of the front line of their lots* owned by them *to the whole improved line* for street and alley improvements, * * * and the city or incorporated town *shall have a lien* upon such lots or parts of lots, respectively, *from the time such improvement is ordered,* for such costs of improvement, collectible as hereinafter provided, * * * and the owners of such unplatted lands bordering on such street or alley or the part thereof to be improved *shall be liable* to the contractor for their proportion of the cost *in the ratio of the front lines of such unplatted lands* owned by them *to the whole improved line;* and in making the *assessment* against such owners for the improvement of such lots or parts of lots and unplatted lands [the cost] shall be *assessed upon the ground fronting* or immediately *abutting* on such improvement *back* to the distance of *one hundred and fifty feet* from such front line, and the city or incorporated town *and the contractor shall have a lien* thereon for the value of such improvement. * * * Any mistake in the description of the property or in the name of the owner shall not vitiate the lien of such *assessment.* Such city or town shall be liable and pay for all that part of such street or alley improvement as shall be occupied by the street and alley crossings, and may order that any part of the total cost of any of the improvement in this act mentioned shall be paid out of the general fund." The fourth section provides for an allowance to the owner of any lot who, before the contract is let, has made any improvement in front of his lot in accord-

ance with the general plan of improvement for his street; and provides for taking security from the contractor. The fifth section: "When any such contract shall be made, or shall have been heretofore made, and shall have been in progress of fulfilment, the common council   *   *   * shall have power to cause estimates to be made from time to time of the amount of work done by the contractor, and to cause the same to be paid out of the treasury, deducting a reasonable amount of percentage to secure the completion of the contract until the whole shall be finished, and to prescribe the time in which the whole shall be completed, and such estimates shall be a lien upon the several parcels of ground upon which they are assessed to the same extent that taxes are a lien, and·shall have the same preferences over other demands, and such liens shall be in favor of the city or incorporated town, and the owner of the certificates or bonds hereinafter mentioned to secure the city or incorporated town and such owners the reimbursement for such cost of improvement hereinafter provided for. The common council of such city or the board of trustees of such town, with the concurrence of two-thirds of the members thereof, may order or cause any or all of the improvements mentioned in the first section of this act, and repairs of any kinds of streets and alleys to be made in like manner, without such petition, and either charge and cause any or all·of the expenses thereof to be assessed and collected, as hereinafter provided, when petition is made, or if it is deemed just and right by the common council of such city or the board of trustees of such town to cause such expenses, or any part thereof, to be paid out of the general revenue of the city or incorporated town." The sixth and seventh sections are set out in the majority opinion. The eighth section authorizes the issuance of improvement bonds, in anticipation of the collection of the assessments, for the payment of which bonds the lot owners provide the money in annual instalments, and commands that, after the assessment has been confirmed by the

common council, "no suit shall lie to restrain or enjoin the collection of such assessment, and the validity of such assessment shall not be questioned, and such bonds, when issued, shall transfer to the owner thereof all the right and interest of .such city or incorporated town in and to such assessments and the liens thereby created, with full power to enforce the collection thereof by foreclosure or otherwise, under any of the provisions of this act." The ninth section provides for the foreclosure of assessment liens, and transfers the city's interest in the liens to the holders of the bonds. The tenth section authorizes the collection of assessments by the city treasurer by sale upon precept, and allows the lot owners the right of appeal to the circuit court of the county, but "in case the court and jury shall find, upon trial, the proceedings of said officers subsequent to said order directing the work to be done are regular, that a contract has been .made, that the work has been done, in whole or in part, according to the contract, and that the estimate has been properly made thereon, then said court shall direct the said property to be sold and conveyed by the sheriff thereof as the said treasurer is hereinafter directed to sell and convey property liable to street improvements." In regard to section ten, it is evident that, under any construction of section seven, the appeal from the precept has become nugatory; for, the assessments having been made conclusive on the hearing before the council, the property owner may not again contest what has been finally adjudicated. But section ten is important in considering the changes made in street improvement proceedings by the Barrett law.

Now, the question being under which of the two inconsistent methods of laying assessments the legislature intended to act,—whether under the "old" constitution according to special benefits declared as a matter of law, or under the "new" according to special benefits to be determined by the assessing officers as a matter of fact,—the answer should require an examination of the whole statute, in the light of

the circumstances surrounding the legislators in 1889, in order to determine the entire scope and manifest intent of the act. And the first of these circumstances is the attitude of this court.

For nearly forty years prior to 1889, street improvements were made in this State under laws that declared that the special benefits and the assessments by frontage for the entire cost, except for street and alley crossings, equaled each other; and this court uniformly held that such laws were in harmony with the "old" constitution. In *Snyder* v. *Town of Rockport*, 6 Ind. 237, May term 1855, an act was assumed and declared to be constitutional that directed the town board, on petition of two-thirds of the owners of abutting property, to assess the whole cost upon all abutting property and to apportion the cost according to the last assessed valuation of such property. In *Goodrich* v. *Turnpike Co.*, 26 Ind. 119, May term 1866, the constitutionality of a local assessment act, wherein the legislature had fixed the "special benefits" arbitrarily as a matter of law, was under consideration, and this court, among other things, said: "It is claimed that the assessment authorized by this statute is not a tax, not a burden or charge imposed by the legislative power of the State upon persons or property to raise money for public purposes, but the exercise of the power of eminent domain, in taking private property for public use, 'without just compensation'. There is a manifest distinction between the taxing power and that of eminent domain. Both, in effect, appropriate private property to public uses. They differ only in degree. Taxation exacts money from individuals as their share of the public burdens, and the tax payer, according to the theory of our system, receives a *just compensation* in the benefits conferred by the government in the proper application of the tax. When, however, property is appropriated by virtue of the right of eminent domain, it is taken, not as the owner's share of a public burden, but as so much more than his share. Many of our

public improvements are local in their character, and confer special benefits on those in their immediate vicinity. By a long line of decisions of this court, these benefits may be set off against damages sustained by the appropriation of private property for public use, in the construction of such works. In the case in judgment the legislature has determined, and this matter is within its power, that this is a proper subject for taxation, and that the burden imposed is the just share of each person embraced in the provisions of the act." In *Palmer* v. *Stumph,* 29 Ind. 329, May term 1868, it was said: "By this act the rate is the same upon every one within reach of the assessment, *that is the exact benefit each may receive from the improvement of the street. The legislature have adopted this method of reaching that result.* It is certainly reasonable to suppose that, as a rule, property along the line of a street improved will be equally benefited; that, as a rule, the *property fronting upon a street, foot by foot, will be of equal value and should therefore be equally assessed."* In *Ray* v. *City of Jeffersonville,* 90 Ind. 567, May term 1883, an assessment under the street improvement law of 1881 was attacked on the ground that the act was in violation of section 21 of article 1 of our Constitution, which provides that "no man's property shall be taken by law without just compensation"; and the court held the act valid as against that objection. This court, through Mitchell, C. J., in *Ross* v. *Stackhouse,* 114 Ind. 200, November term 1887, declared: "Special assessments for street and other similar improvements are upheld upon the theory that each lot or tract of land assessed is benefited in a special and peculiar manner in a sum equal to the amount estimated or assessed against it." Through the same judge the court in *Garvin* v. *Daussman,* 114 Ind. 429, May 8, 1888, in speaking of the kind of notice and hearing that was thought to satisfy all constitutional requirements, said: "In the imposition of poll or occupation taxes, where a certain sum is assessed against each individual exer-

cising a given avocation, or according to his age, *without regard to actual benefits*, the necessity of notice and a hearing is reduced to a minimum. To a measurable extent, the same principle is involved when the cost of an improvement is, as by law in proper cases it may be, apportioned by mere mathematical calculation, according to a certain rate per front foot.    *    *    *    The principle which underlies and upholds special assessments, such as that involved in the present case, is, that the lands assessed are enhanced in value to an amount equal to the cost of the improvement, which is to be apportioned among those specially benefited in the manner prescribed by law.    *    *    *    It is essential to the public good that the necessity for street and other public improvements, and the cost of making them, and such other proceedings as are necessary to insure the prompt execution of the work, be determined and taken in a comparatively summary way.    *    *    *    If, therefore, the law provides for *giving notice* and *for a method* whereby the property owner may ultimately challenge the *correctness* of the assessment made against his property, in respect to whether it was made in good faith, *without intervening mistake or error, and according to the method and under the safeguards provided by the law*—the constitutional provision is deemed to be satisfied."

Taking the foregoing as a fair illustration of the judicial history of the question down to 1889, I can not agree in the statement that the constitutionality of the front-foot method had been considered only in reference to the provision requiring uniformity and equality in taxation and never in reference to "just compensation" and "due process of law"; and I am unable to reconcile such a contention with the admission that Dillon and Cooley were not without warrant in classing Indiana "as one of the majority states upholding the doctrine that it is competent for the legislature conclusively to declare that the total cost of a local improvement shall be assessed equally against the frontage".

The legislature of 1889 not only knew this judicial history but also were aware that it was occasioned by a uniform and consistent course of legislation since 1852. Prior to 1889 the street improvement laws had been changed many times, and yet it is agreed that the underlying plan remained the same. In 1889 certain changes were made; and my brethren, if I understand them, state that the legislature intended to abandon the whole theory of local assessments under the "old" constitution and to adopt the theory of the "new". And this, on account of the people's dissatisfaction with the law. But it is said that "It is evident that the discontent did not arise from the method of frontage assessments as a rule, for that principle had been consistently maintained in every enactment since 1852 and was carried into the Barrett law".

The last declaration of this court on the subject of street improvements, prior to the meeting of the legislature in January, 1889, was made in *Garvin* v. *Daussman*, 114 Ind. 429, in May, 1888. In that case, as in some earlier ones, the constitutionality of the arbitrary front-foot method was upheld not only in respect to "uniform and equal taxation", but also in respect to "just compensation" and "due process of law"; and the court then advised the legislature that "the determination of the common council * * * may be made conclusive. * * * It is essential to the public good that the necessity for street and other public improvements, and the cost of making them, and such other proceedings as are necessary to insure the prompt execution of the work, be determined and taken in a comparatively summary way". In making up the Barrett law, the legislature did not strike out into new fields; but they took, as the foundation to work upon, the old street improvement statutes of this State, which are confessedly based upon the arbitrary front-foot method; and adopted from other states certain elements that stood as component parts of the arbitrary front-foot method. Compare Bates Ann. Ohio St. 1899, §§2293a,

1-9, and 2293b, c, and d; also New York laws 1870, ch. 619, 1881 ch. 689, 1884 ch. 510, 1885 chs. 396 and 406, 1893 ch. 550, 1895 ch. 816; and *Spencer* v. *Merchant*, 100 N. Y. 585, 3 N. E. 682; *Jones* v. *Town of Tonawanda*, 158 N. Y. 438, 53 N. E. 280; *Lyon* v. *Town of Tonawanda*, 98 Fed. 361. The new features that were not in our former statutes are the provisions for the resolution of necessity, for the issuance of bonds and the foreclosure of the liens represented thereby, for the laying of the assessments by the city engineer, and for the substitution of the common council for the circuit court as the tribunal whose judgment, after a "hearing"; makes the assessments conclusive. As these features are well adapted to fit into the scheme of laying street assessments by the arbitrary front-foot method, and as such was their place in the legislative plans of Ohio and New York and perhaps other states, it strikes me as a somewhat violent assumption to say that the legislature of 1889 must have intended, by the introduction of these provisions, to grant the property owners rights *beyond* those given by the "old" constitution that was then in force and to afford them the protection guaranteed by the "new" constitution of 1898. The proper assumption would be that the legislature did not intend to depart from a long settled policy or to have the basis of assessment, which was brought forward from our former statutes, viewed in any other light than that of its settled construction. The new provisions, except section six, do not purport to fix any rule for laying the assessments. Section six expressly makes frontage the basis for street assessments. So, it is found that in the only new section which speaks of the method of assessment the same plan is apparent that inheres in the old matter which was reënacted. And in no other way could section six have been harmonized with the former laws which were used as the foundation of the new. Yet on the word "hearing" in section seven is hung a construction which, as it seems to me, conflicts not only with the former laws but also

with the concurrently new matter in section six. My brethren seem to have overlooked the consideration that, in enacting the Barrett law, the legislature may have found that the then existing statutes, which permitted the property owners separately and one at a time to contest in the circuit court the correctness of their assessments, did not afford a satisfactory basis for the issuance of bonds, and that the substitution therefor of a "hearing" before the common council, at which all objections could be disposed of together, furnished "a comparatively summary way" of rendering the assessments conclusive, as suggested in *Garvin* v. *Daussman*, 114 Ind. 429.

It seems to me that my brethren have acted upon the plan of first adopting a construction of section seven and then construing the rest of the act (so far as it is set forth by them) in a way to conform thereto. I think this is not a proper method of interpretation; and I can not, under the rules of construction as I understand them, find the meaning in section seven that has been given to it.

The language of the section furnishes no foundation for the construction adopted. It makes no allusion to special benefits. It fails to command the city to refrain from assessing upon the abutting lot an amount in excess of the special benefits actually received by it, and to refrain from assessing upon the property in the taxing district an amount in excess of the sum total of the special benefits actually received by the several parcels of contributing property. ·It fails to command the city to pay from the general treasury the excess of cost above the total special benefits,—the part that benefits only the municipality at large. Benefits and damages are the varying degress above and below zero on the compensation-scale. If a lot owner's special benefits were below zero, from what source and by what method is he to be made even? The section fails to provide. These omitted matters might have been fully and explicitly supplied by the legislature by tacking them onto the word "hearing",

but it did not do so.  My brethren say that "From the term 'hearing' is necessarily implied the power to administer some adequate remedy".  That remedy, they say, must be a determination of special benefits actually received, for otherwise the legislators are accused of insincerity, dissimulation and mockery.  The argument seems to me a plain begging of the question.  The question is:  Did the legislature intend to provide the "hearing" required by the "old" constitution then in force, or the "hearing" required by the "new" constitution of 1898?  The argument seems to assume that in 1889 no "hearing" was a "hearing" unless it was for the purpose of determining benefits actually received as a matter of fact.  Although I agree in the statement that well-disposed taxing officers would remedy their omissions and mistakes, if they noticed or were informed of them, without any "hearing", yet I say that the legislature never had the power to frame a law that shut off the property owner on the presumption that the assessing officers would make no omissions nor mistakes.  In all valid taxation, three things have ever been required.  First, a law directing the assessing officers how to proceed.  The authority to tax is exclusively a legislative power.  "This is manifest from the slightest consideration of what taxation is.  It is *the making of rules and regulations* under which the necessary revenues for all needs of government are to be apportioned among the people and collected from them."  Cooley on Taxation (2nd ed.), 41.  Second, an assessment by the proper administrative officials, which must be made in substantial conformity to the method prescribed by the law,—for the expression of one method is the exclusion of all others.  Third, an opportunity for the property owner to have a "hearing" before some tribunal, with judicial powers, on the question whether or not the assessing officers have substantially complied with the method prescribed by the law.  So, the word "hearing" does not necessarily imply a hearing on special benefits as a matter of fact; for, on the ques-

tion of the correctness of special assessments for special bene-
fits declared as a matter of law, the property owner was
entitled to a "hearing", and it would have been oppression
and confiscation to have denied it to him.

The city is the actor in prosecuting the proceedings that
result in a judgment making the assessments conclusive
upon the lands of abutting proprietors. The engineer files
his report assessing each piece of contributing property a
certain sum as he has computed it according to the commands
of section six. The hearing provided for in section seven is,
according to the language of the act, a *hearing* upon *the
report of the engineer and the assessments therein.* It is
axiomatic that in all hearings, the tribunal must determine
the case *upon the charge filed against the defendant.* This
is true, not only in all cases before regularly ordained courts,
but also in all special proceedings before special tribunals.
In proceedings before city commissioners for the opening
and vacation of streets (§3166 *et seq.* R. S. 1881 and Horner
1897, §3629 *et seq.* Burns 1894), before circuit courts and
before boards of county commissioners for the establishment
of public drains (Ch. 49 R. S. 1881 and Horner 1897, Ch. 53
Burns 1894), before boards of county commissioners in the
various proceedings relating to free gravel roads (Ch. 70
R. S. 1881 and Horner 1897, Ch. 76 Burns 1894), the
landowners are afforded a hearing on the question of special
benefits, not because they are offered a *hearing*, but because
*the charge*, upon which the hearing is had, *is that their par-
ticular lands are severally specially benefited.* In all these
cases, the *question* for the tribunal to determine on the hear-
ing *is whether the engineer* (or viewers or corresponding
officials who formulate the *charge* against the property
owners) *has fully, impartially and correctly performed the
duties laid upon him by the statute.* If he has, judgment
confirming his action is rendered; if he has not the tribunal
alters or amends, or requires him to alter or amend, his
charge to conform to what it should have been in the first

place if he had complied with his duties under the statute, and then renders judgment on the charge. This principle has been fully recognized in the street improvement cases of *Garvin* v. *Daussman,* 114 Ind. 429, and *City of Terre Haute* v. *Mack,* 139 Ind. 99. In *Hutcheson* v. *Storrie,* 92 Tex. 685, 51 S. W. 848, 852, 45 L. R. A. 289, June 19, 1899, the supreme court of Texas had before it a law that is exactly the same in essentials as the Barrett law. After the engineer files his report of the total cost, etc., and of the assessment upon each lot by frontage, the city council gives notice by publication of a *hearing* when the property owners may "object to any such acts and proceedings and show wherein they have been or may be wronged or injured thereby, and ask for a revision or correction of the same". The city council can not make the final assessments until all objections have been heard and determined. It will be observed that the Texan property owners were given an opportunity to "show wherein they have been or may be wronged or injured" by the front-foot assessment. This is certainly as broad as the right to "make objection" to the report and the assessments therein. And the court said: "The foregoing provision of the charter authorizes the property owner to call upon the city council to revise or correct *errors* committed in the proceedings had in assessing the cost of improvement against his property, *but it does not empower the council to do anything that it or its officers could not have done in the first instance.* The words 'revision' and 'correction' mean that the council may be called upon to review that which had been done, and *to make the proceedings conform to the law. Vinsant* v. *Knox,* 27 Ark. 272. The city council and the officers acting under the authority of the charter of the city of Houston having no power in the first instance to consider the question of benefits in fixing the amount to be charged against Mrs. Hutcheson's property, a revision and correction of *the acts done* could not give relief against the wrong complained of.

\*   \*   \*   The claim that, upon petition of Mrs. Hutcheson, the council could have afforded relief from the unlawful exaction, is wholly unsupported by the terms of the law, and is in direct conflict with many of its provisions. *The wrong did not consist in a failure to follow the directions of the law, but in obeying its unconstitutional requirements".* So, on the *hearing* mentioned in section seven of the Barrett law, the inquiry must be confined to the question whether or not the assessment reported by the engineer has been made as it ought to have been made in the first instance, that is, in conformity to the terms of the law prescribing his duties,—unless that hearing, of all the hearings in the world, is to be made an exception to the universal rule that a tribunal must determine a case on the charge filed against the defendant and is not at liberty to discard that charge and reach out and draw in some other from undefined sources and by undefined methods.

On the "hearing", the common council "may adopt, alter or amend such report and the assessments therein". It is true that "alter" means "to make otherwise". But it does not follow that the report and the assessments therein can not be made otherwise than the engineer made them except by abandoning the method of testing the assessments by the standard of special benefits declared as a matter of law and following the method of testing the assessments by the standard of special benefits actually received determined as a matter of fact. If the engineer made any mistakes in following out the front-foot method prescribed for him, his report and the assessments therein would be made otherwise by correcting the errors. But "alter" is used in connection with other words. The council "may amend" the report and the assessments therein. "Amendment" is usually understood in law to mean the supplying of deficiencies. If the engineer made any omissions of property or other material matter, his report and the assessments therein would be amended by supplying the deficiencies. The council

"may adopt" the report and the assessments therein. If the engineer, as the assessing officer, has made no mistakes nor omissions in laying the assessments in his report, surely the council, as a reviewing tribunal, should be permitted to confirm the assessments. In taking the actual language of the clause, something more than the word "alter" should be considered. For example, it makes a difference whether the auxiliary verb "may" or "shall" is connected with "alter". Standing alone, "alter" can be given the broadest definition to be found in the dictionaries; and if the auxiliary verb and the object are to be assumed and not taken from the actual language of the clause itself, it is possible, of course, to say that the common council "*shall* alter the *basis* of the assessments in the engineer's report". But the actual language is that the council may adopt, alter or amend the engineer's report and the assessments therein. The method on which the engineer's report and the assessments therein are based has been continuously asserted throughout the preceding sections. The canons of interpretation require that general words be limited to the sense of the context. "Not only are words and provisions modified to harmonize with the leading and controlling purpose or intention of an act, but also by comparison of one subordinate part with another; that is to say, the sense of particular words or phrases may be greatly influenced by the context, or their association with other words and clauses." Sutherland Stat. Const. §262. "General words or clauses may be restricted to effectuate the intention or to harmonize them with other expressed provisions. Where general language construed in a broad sense would lead to absurdity, it may be restrained. The particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense they were intended to be used as they are found in the act." Sutherland §246.

To insert into the seventh section the elements that the legislature failed to include is, I think, not only violative of

Adams *v.* City of Shelbyville.

the plain language of that section, but is destructive of other parts of the act. The primary rule of construction is to take the language of the legislature in question according to the plain and ordinary meaning of the words, without adding to or taking therefrom, and, if the language so taken does not create an ambiguity, to accept it as declaratory of the legislative intent. But if there were an ambiguity, then the next rule of construction should require the court so to resolve the ambiguity as to give effect and purpose and meaning to the other parts of the act. If the ambiguity (supposed, for the sake of argument) were resolved in favor of the idea that the council on the hearing is required to determine the assessments on the basis of special benefits actually received, then the sixth section is deleted from the act and the legislature is convicted of the folly of having provided elaborately and explicitly for a method of assessing upon each front foot throughout the improvement an equal sum (a method that necessarily excludes the consideration of special benefits actually received) and then declaring that on the hearing the council, not *may,* but *shall* disregard and throw aside all that has been done relating to assessments and begin *de novo* and make the assessments by the method of determining the special benefits actually received. My brethren seek to save some purpose and meaning in section six by holding, as I understand them, that the engineer does not make the assessments but simply reports certain facts for the enlightenment of the council when that body enters upon the making of the assessments according to special benefits actually received. If this were true, section six would nevertheless accuse the legislature of dealing in futilities. How would the council, when that body purposes to enter upon the making of the assessments according to special benefits actually received, be enlightened by being informed of the total cost of the improvement? The average cost per front foot? The name of each property owner? The number of front feet owned by each? The amount due

upon each lot, ascertained and fixed by multiplying the cost per front foot by the number of front feet of each lot? The legal description of each lot? How would these items afford the council any information on those matters on account of which my brethren say that special benefits actually received should be considered, namely, that it is "clear that all property bordering upon a municipal highway is not affected in the same way by an improvement of the latter; that in some cases the grade may be so raised or lowered as to impair most seriously the use and value of the property; in others, that some property may be situate upon a general level, highly improved and in a business part of the city, while others upon the same street may be remote from business, lying low and near a water course, and practically worthless for business or residential purposes; in others, some abutting lots may be twenty feet and others 200 feet deep"? But it is not true that the engineer simply reports certain facts and makes no assessments. He is required to ascertain and fix the amount due upon each lot by multiplying the average cost per front foot by the number of front feet of each lot. This is an assessment, as will hereinafter more fully be shown. It is sufficient for the present to point out that the legislature has in express words defined the engineer's ascertainment and fixing of the amounts due upon the several lots as "assessments". The legislature says that the matter in review before the council as a tribunal is the engineer's report and the *assessments therein*. And the matters, other than the assessments, in the engineer's report are material only on the theory that the property owners are afforded a "hearing" to challenge the correctness of the assessments, as "hearing" was defined in *Garvin* v. *Daussman*, 114 Ind. 429. It is true that, if a property owner's assessment were made on the basis of special benefits actually received, it could be figured out that the assessment amounted to so much per front foot, $4.98 in one case and $1.30 in another. But it would have been just

as reasonable for the legislature to require the engineer to report the number of persons in each property owner's family; for, in the same way, it could be figured out that the assessment amounted to so much per head.

To insert into the seventh section the elements that the legislature failed to include would also destroy the fifth section of the act. That section empowers the council to pay the contractor from time to time during the progress of the work. Such payments are made out of the treasury and are declared to be liens upon the abutting property. The city incurs no personal liability to the contractor, but acts merely as an instrumentality in collecting money for the contractor from the property owners. *Quill v. City of Indianapolis*, 124 Ind. 292, 7 L. R. A. 681; *Spidell v. Johnson*, 128 Ind. 235. The plain meaning of the section is that if the city shall *advance* money from the treasury to the contractor, the city shall have the absolute right to *reimbursement* from the property owners by means of the liens that, by this fifth section, are put upon the abutting property. If the city, under section five, should advance to the contractor ninety per centum, say, of the cost, and if, under section seven as my brethren construe it, the city must limit the assessment against each parcel to an amount not exceeding the special benefits actually received by it, fifty per centum, say, of the cost, then the plain meaning of section five is utterly destroyed and the city would be left with a loss of forty per centum, say, of the cost, although the city had begun and carried forward the improvement under a resolution declaring that all of the cost, except for street and alley crossings, should be borne by the abutting property. If city officials had understood this necessary result of the construction contended for in this and other cases pending in this court, they might not have been so ready to deprive themselves of so much cash or debt-incurring margin to use for other purposes.

To insert into the seventh section the elements the legis-

lature failed to include would also destroy the third section of the act. This section provides *the fund for paying the contractor*. As soon as the work is determined upon, the council makes a contract with the best bidder. The contractor gives a bond for the prompt and·faithful performance of the work. The contract is of course binding upon him, and he must execute it or be liable on his bond. He enters into this binding contract on the faith of a positive legislative declaration: "The city or incorporated town shall be liable to the contractor for the contract price of said improvement, and *the owners of lots* or parts of lots bordering on such street or alley or the part thereof to be improved, * * * *shall be liable* to the city for their proportion of the costs *in the ratio of the front line of their lots* owned by them *to the whole improved line* for street and alley improvements, * * * and the city or incorporated town shall have a lien upon such lots or parts of lots, respectively, from the time such improvement is ordered, for such costs of improvement; * * * [which] shall be assessed upon the ground fronting or immediately abutting on such improvement back to the distance of one hundred and fifty feet from such front line, and the city or incorporated town and *the contractor shall have a lien thereon* for the value of such improvement." As already stated, the city is not personally liable to the contractor. If the city has advanced money, it has the lien by which to secure reimbursement. If the contractor receives his contract price in improvement certificates or bonds, he has the lien by which to collect the contract price of his labor and materials. This section also says that the city "shall be liable and pay for all that part of such street or alley improvement as shall be occupied by the street and alley crossings". The plain meaning of section three is that, unless the city voluntarily assumes in advance to pay some definite percentage of the total cost, the city shall pay for street and alley crossings and the property owners shall pay for the rest of the im-

provement; and that, if the city assumes a certain percentage, the residue of the total cost, except for street and alley crossings which must be paid for by the city, is to be borne by the property owners. By the implied power that my brethren find in section seven, this meaning is destroyed. If the assessments are to be measured by the actual benefits which the property owners receive from the improvement, it is evident that the improvement as a whole must be considered. The question would be: How much special benefit does each lot actually receive from this improvement? And each owner's contribution towards the cost as a whole would be determined accordingly. And the excess of cost, as one sum, would have to be paid by the city. It seems indisputable that the total cost would thus be divided between the city and the property owners on a contingency that bears no relation to the number of feet in the street and alley crossings. Yet, section three clearly separates the improvement itself and the liability therefor into two distinct parts.

Further, in regard to section three, my brethren say that it should be noted that the provision is "That the cost shall be *estimated* by the running foot, not assessed". They quote the definition that an assessment is the "adjusting of the shares of a contribution towards a common beneficial object according to the benefit received". Here, again, my brethren seem to revert to the idea that the plan required by the "new" constitution is the only one in which special benefits are the sole basis for special assessments. But as already shown special benefits were the common starting point of the two divergent lines of thought. So, if the definition selected by my brethren were the one the legislators had in mind, it would not disclose which method they intended to pursue. But it seems clear to me, from an examination of the whole act, that the definition the legislators intended to express was that an assessment is "an *official estimate* of the sums which are to constitute the

basis of an apportionment of a tax between the individual subjects of taxation within a district." Anderson's Law Dict. In section three, the part of the sentence that commands how the *estimate* shall be made and what the liability of the lot owners shall be, ends with a semicolon, and the sentence proceeds: "and in making the *assessment* against such owners for the improvement of such lots or parts of lots and unplatted lands [the cost] *shall be assessed* upon the ground fronting or immediately abutting on such improvement back to the distance of one hundred and fifty feet from such front line, and the city or incorporated town and the contractor shall have a lien thereon for the value of such improvement". Again in section three: "Such *assessments* with the interest accruing thereon, shall be a lien upon the property *so assessed* and shall remain a lien until fully paid." And in section ten : "In case any of the owners of lots or parcels of grounds on which such *assessments* have been made shall fail or refuse for the space of twenty days after the date of the *estimate* to pay the amount *thereof* due by such person to such contractor, such contractor shall file his affidavit in the clerk's office of said city, stating that the whole or some part of said *assessment* remains unpaid," etc. And again in section ten: "And in case the court and jury shall find, upon trial, the proceedings of said officers subsequent to said order directing the work to be done, are regular, that a contract has been made, that the work has been done, in whole or in part, according to the contract, and that the *estimate* has been properly made thereon, then said court shall direct the said property to be sold," etc. It therefore seems clear that the legislature understood an "official estimate" to be an "assessment". And the legislature did not confine itself to the use of the word "estimate"; for, in the part of section three that my brethren have omitted, it appears in plain words that the lots shall be *"so assessed"*.

Again, it is said that section three contains no mandate

that the property "shall ultimately be required to contribute equally per front foot". I do not see how language could be made clearer: "The owners of lots * * * shall be liable * * * in the ratio of the front line of their lots owned by them to the whole improved line". This liability is secured by a lien. It is the fund on which the contractor relies for payment. And it is the only fund, if the city is up to its debt limit, or becomes so after the contract is made and before the work is completed.

My brethren say that section three requires "that the liability shall relate to the frontage". But I take it that they do not mean to concede that the liability shall be according to the frontage. They only mean that the liability for special benefits in fact received, after it is determined at the conclusion of the work, is susceptible of being figured into a relation with the frontage,—a phase of the subject that has already been noticed sufficiently. But it is said that "the measure of liability and lien here mentioned is only conjectural at most, since they arise before an ascertainment of the facts, by measurement, necessary to their definite determination". The order for the improvement, which enters into the contract, and the contract itself, disclose the dimensions, location and character of the work, and the price per front foot in terms, or in terms reducible to the front foot. So far as the contractor is concerned, the moment the contract is let he can determine the amount of liability of each property owner and of the city for street and alley crossings as well as when the work is finished. It is true that in the assessment made by the engineer, at the conclusion of the work, the "total cost" may include other items, such as advertising, etc.; but in these matters the contractor is not interested, for the contract is the limit of his claim and lien. *City of Huntington* v. *Force*, 152 Ind. 368. But if there were any uncertainty in the amount finally to be allowed the contractor, no uncertainty would thereby be introduced into the liability, for the lien by the front foot

could be fixed in advance for whatever amount the contractor's due proved to be.

In endeavoring to leave some purpose in section three, my brethren, if I comprehend their meaning, hold that the section does not fix any basis for assessments, but only provides for a *prima facie* calculation of liability. This seems to me a purpose that is contrary to the entire scope and manifest intent of the act. But I admit that it would be some purpose, if all the lot owners, except the "aggrieved" mentioned in section seven, might, by not objecting and not asking to be heard, accept the *prima facie* calculation as a correct statement of their liability. Such a construction, however, would at once run counter to the objection that the statute did not provide for a "uniform and equal" rate of assessment. Suppose that the *prima facie* calculation was $1,000 against each A and B, who own equal frontage; that A is "aggrieved" and B is not; that A proves to the satisfaction of the council that his special benefits actually received are $500; that A offers to prove that B's special benefits actually received are $1,500; that the council agrees with A as to the truth of the matter, but holds that, since B has made no objections nor appeared to be heard, B has the right to accept the *prima facie* amount as the true amount; —then B receives $500 in actual benefits that he does not pay for, and A is compelled to pay (1) his special benefits actually received, (2) his proportion of the city's contribution on account of general benefits, and (3) his proportion of the special benefits accruing to B and all others similarly situated. Now, to avoid this difficulty, it is further held that all persons whose lands are included in the engineer's report are bound to take notice that the council will so increase or decrease the *prima facie* calculations as to make them equal the special benefits actually received. And, in holding that the *prima facie* calculations are not even *prima facie* the true amounts but that the amounts must be adjusted on the radically different basis of actual benefits, my brethren come

around to the original position of discarding all the steps provided for in the sections preceding the seventh and of requiring the council to determine the assessments *de novo* on the basis of actual benefits, thus depriving section three of any intelligent purpose.

It seems to me incredible that the *legislature intended* that its positive and explicit mandates, expressed in the prior sections, should be overborne by an implication read into section seven. And I think it equally faulty to suppose that the *legislature intended* that the contractor should bind himself, under penalty, to perform work, for the payment of which section three gives him a lien upon the abutting property by the front foot, and then that the common council, at the procuration of the property owners, should abrogate the contract, should destroy the improvement certificates or bonds, should approve and accept the work and deprive the contractor of his pay. To quote from *Hutcheson* v. *Storrie,* 92 Tex. 685, 51 S. W. 848, 45 L. R. A. 289: "In support of this conclusion, we call attention to the potent fact that the city had entered into a contract with Storrie for the performance of the work at a stipulated price and with the agreement that he should be paid in improvement certificates, which would hold a lien upon the property, before the *amount* of the assessment was ascertained. If the engineer, for instance, *committed an error* in estimating the cost of the work in front of Mrs. Hutcheson's property, then a revision and correction of that act by the council could be had and the wrong could be corrected, because the contract itself furnishes the data, *and the correction would accord with the contract. If, however, the council had changed the basis of the assessment* against Mrs. Hutcheson's property *from the costs of the work to that of benefits received* by the property, whereby the amount assessed would be lessened, *the contract would have been annuled.* A construction should not be placed upon the language that would empower the city to destroy the contract without the consent of Storrie."

If the pavement contractors had understood this necessary result of the construction contended for in this and other cases pending in this court, they might not have been so ready to take contracts under an act which deprives them of the absolute right to definite liens on the lots of the property owners and remits them to the uncertainty of collections from the municipalities. In *Cason* v. *City of Lebanon,* 153 Ind. 567, it was held that a contractor, in contracting to do street improvement work under the Barrett law, must take notice of the city's indebtedness; that, if the contractor could not collect from the city for its part of the liability, the whole contract was not destroyed; that the consideration to be paid by the abutting property owners was sufficient to support the contract; that the property owners had no ground of complaint unless the contractors put in higher bids than they would have if the city's part of the expense was collectible. This strikes me as justifiable doctrine, if the improvement itself and the liability therefor are considered as divided into two distinct parts which may be known to and examined by both the contractor and the property owners when the contract is let and before the work is begun. But under the construction of the Barrett law that is now adopted, the contract, *at the time it is made,* is severable neither as to the work nor as to the liability therefor. After the work as an entirety is done, a severance of the total liability is made; but, until then, no one could tell what was the extent of the city's liability or what the property owners'. If, at the time the contract is entered into, the city be indebted to the limit, it is likely that the contractor's bid would be higher on account of the uncertainty of getting his pay. Yet, no matter how high his bid, the chance of even getting his money back would depend upon a contingency, after his labor and materials were expended, entirely within the power and discretion of the adverse parties to the contract. And if, at the time the contract is entered into, the city have a debt-incurring margin to the amount of the con-

tract, the council, without the consent of the contractor, could exhaust that margin in water works, electric lights, etc., and then find that the actual special benefits to the property owners were not half the amount of the contractor's expenditures.    Street improvements are public improvements.    Special benefits are benefits that are not common to the citizens in general.    How much the contractor may collect as special benefits and how much as general benefits, is left for his adversary in the contract to say.

By my brethren's reading of section seven, that is, that the council on the hearing upon the engineer's report and the assessments therein shall disregard the method of assessment pursued down to that point and upon which the contract is based and shall substitute a *de novo* inquiry into the special benefits actually received, the legislature is accused and found guilty of ignorance of the meaning or even the existence of the word "benefits".    Yet on the statute book, as already pointed out, there were many instances in which assessments for improvements were carefully provided for on the basis or by the method of ascertaining the special benefits as a matter of fact and limiting the assessments to that amount and apportioning the cost in ratio to such benefits; *and in this very statute, the Barrett law, assessments for the construction of sewers are directed to be limited and apportioned according to benefits.*    Hereinabove only the material parts of the act relating to street improvements have been referred to.    In reference to the assessment lien given in section three, the language concerning sewer construction is that "the cost of any such sewer *shall be apportioned among the lands, lots, and* parts of lots, *benefited thereby, and according to such benefits,* * * * *and the owners* * * * of the lots or parts of lots benefited by the construction of such sewer *shall be liable,* * * * for the construction of such sewer, *for the benefit of such lots or parts of lots* thereby."    In reference to the duties of the engineer in making his report to the council, the first six

items from the sixth section relate to street improvements. The seventh item in that section relates to sewer construction: "Seventh. *In the case of the construction of a sewer, a description of each lot or parcel of lot benefited thereby, together with the owner's name, and the fair proportion of the cost of such sewer, according to the benefits conferred thereby, that should be assessed against such lot or part of a lot.*" If a sewer is constructed and a landowner objects to his assessment, the hearing on the engineer's report, provided for in section seven, gives him his "day in court" on the question of benefits *because the charge* on which the hearing is had *is that his lands should be assessed a certain sum according to the benefits conferred.* Sutherland says that attention should be given not only to the language used but also to "the words or expressions which obviously are by design omitted". §239. See also §241. It seems strange to suppose that the legislature did not know the vital difference between the engineer's assessment in street improvement cases and in sewer cases, between the lien declared in section three for street improvements and the lien declared in the same section for sewer construction, between a method of legislatively assuming and fixing the special benefits at the cost per front foot as a matter of statute law and a method of providing for a determination of the actual benefits as a matter of fact. And the legislature's nice particularity in making these distinctions can not be overborne excepting by reading into section seven an implication that renders meaningless many parts of the act and ignores others. All of the matter in the Barrett law in reference to sewer construction was a new feature in street improvement statutes in this State. I believe my brethren state the rule of construction correctly: "The intention is to be ascertained by considering the entire statute; and we must proceed as we would with any other composition, construing it with reference to the leading idea and purpose of the whole instrument. The general intent

is the polar star by which the meaning of any part is to be determined with a view to harmonizing the entire act." But I do not understand the purpose in stating the rule, if it is not to be followed. I find that material parts of sections three, five, six, eight, nine and ten, and the whole of the interlaced sewer law are omitted from consideration.

It is axiomatic that the constitutional provision authorizing the levy and collection of taxes is not self-executing. It is fundamental that the provision can not be made operative by the executive department, nor by the judicial department, but only by the legislative department. It is elementary that the power must be carried into execution by appropriate legislation and that no taxing bodies or officers can make a valid assessment unless they follow with substantial strictness the precise method prescribed by the statute. If the constitutional provision be read into the statute, it is not perceived how the situation is changed. If the provision is not self-executing as it stands in the Constitution, it is not self-executing when read into the statute. If it can not rightfully be put into operation by the judicial department as it stands in the Constitution, it can not rightfully be put into operation by the judicial department when read into the statute. If it can only be carried into execution by appropriate legislation as it stands in the Constitution, it can only be carried into execution by appropriate legislation when read into the statute. The appropriate legislation necessary to put into execution the constitutional provision for taxation, by the method of limiting assessments to actual benefits in street improvements cases, can not be supplied by the judicial department, it seems to me, without going outside its proper limits.

The constitutional provision that "no man's property shall be taken by law without just compensation" is likewise not self-executing. It is a negative provision,—an inhibition. If the constitutional provision be read into the statute, what is accomplished? If it is only a negative provision,

an inhibition, as it stands in the Constitution, it is only a negative provision, an inhibition, when read into the statute. If affirmative legislation is needed to enable a city to act under the provision as it stands in the Constitution, affirmative legislation is needed to enable a city to act under the provision when read into the statute. In the place of the established principles for ascertaining judicially the legislative intent, substitute the following formula: Take a statute in which the only method prescribed for fixing assessments is by frontage regardless of actual benefits; read into this statute the constitutional inhibition of the laying of assessments by that method; delete from the statute all that conflicts with the inhibition; and amend the statute by adding thereto all the affirmative legislation that is needed to prescribe a method of apportioning and limiting assessments according to special benefits actually received. In other words: Take a piece of paper and erase what is on it so that it becomes a blank; then write upon it the necessary directions by which a constitutional provision that is not self-executing can be executed.

"The certainty and stability of the law are among its chief excellencies. By following this legal injunction the common law has become a symmetrical system; the same authoritative rule applied to statutory construction gives a wholesome precision to dubious generalities, and otherwise removes doubts which arise upon obscure provisions, and has a salutary tendency to give confidence to those who must act upon statutes, but cannot settle their meaning". Sutherland §313. "The aid of contemporaneous construction is invoked where the language of a statute is of doubtful import and cannot be made plain by the help of any other part of the same statute, nor by the assistance of any act *in pari materia* which may be read with it, nor of the course of the common law to the time of its enactment. Under such circumstances the court may consider what was the construction put upon the act when it first came into operation.

Where this has been given by enactment it is conclusive. A contemporaneous construction is that which it receives soon after its enactment. This after the lapse of time, without change of that construction by legislation or judicial decision, has been declared to be generally the best construction. It gives the sense of the community as to the terms made use of by the legislature. If there is ambiguity in the language, the understanding of the application of it when the statute first goes into operation, sanctioned by long acquiescence on the part of the legislature and judicial tribunals, is the strongest evidence that it has been rightly explained in practice. A construction under such circumstances becomes established law". Sutherland §307. "The uniform legislative interpretation of doubtful constitutional provisions, running through many years, and a similar construction of statutes, has great weight. The contemporary and subsequent action of the legislature in reference to the subject-matter has been accepted as controlling evidence of the intention of a particular act." Sutherland §311. "It is to be observed that in the comparison of different statutes passed at the same session or nearly at the same time this circumstance has weight; for it is usually referred to as indicating the prevalence of the same legislative purpose, as rendering it unlikely that any marked contrariety was intended". Sutherland §283. "The practical construction given to a doubtful statute by the public officers of the state, and acted upon by the people thereof, is to be considered; it is, perhaps, decisive in case of doubt." Sutherland §309.

In the light of these canons of construction, it is important to examine the interpretations given to the Barrett law by the legislative, administrative and judicial departments of the State during the ten years that elapsed from 1889 to the adoption of the "new" constitution. But my brethren pass by all of these considerations.

In speaking of the judicial history of the State prior to

1889 they say: "That this court prior to 1889 supported the doctrine that the legislature had constitutional sanction to declare as matter of law that the special benefits to a particular district by an improvement were equally received by bordering property and equal to the total cost, has little force as an argument. The answer to it is that the injustice and hardship resulting from the doctrine, was potential in securing legislative action for the amelioration of the rule." The inquiry being the intent of the legislature, the so-called answer is a begging of the question. The judicial history prior to 1889 is useful in showing a long continued judicial approval of a long continued legislative policy, and in affording the basis for the presumption that no marked contrariety was intended in the Barrett law. But the judicial history since 1889 is more important because the Barrett law itself is involved. This judicial history is found to be a continued approval of a continuation of the long settled legislative policy. Of this, my brethren say: "There is language used in *City of Terre Haute* v: *Mack*, 139 Ind. 99, and perhaps in other cases in this and the Appellate Court, not necessary to the decision of any question presented by the record, that appears in conflict with what is here decided, but, in so far as such language may so appear, it is disapproved." In the first place, I think that an examination of the cases will show that the language disapproved was necessary to the decision of the questions presented by the records. But, whether the language is disapproved because it is supposed to be *dictum* or because it is thought the cases were wrongly decided, the disapproval can not take those cases out of the judicial history of the State. As contemporaneous expositions of the legislative intent, acquiesced in by the legislature, their force is not dependent upon the correctness of the decisions from the court's present point of view. In *Quill* v. *City of Indianapolis*, 124 Ind. 292, 7 L. R. A. 681, May term 1890, this statement was made: "Assessments for street improvements are

upheld on the ground that the adjacent property upon which the cost of the improvement is assessed is enhanced in value to an amount equal to the sum assessed against it and that the owners have received peculiar benefits which the citizens do not share in common." In *Barber, etc., Co.* v. *Edgerton,* 125 Ind. 455, May term 1890, after quoting the extract hereinbefore given from *Garvin* v. *Daussman,* the court said: "We have no reason to doubt the soundness of the doctrine enunciated in this case, and *under this rule* sections six and seven of this act [the Barrett law] afford the owners of property abutting upon a street to be improved a remedy *which the legislature, in its wisdom, deemed sufficient for their protection.*" In *City of Terre Haute* v. *Mack,* 139 Ind. 99, May term 1894, a street improvement was made under the provisions of the Barrett law. The assessments were levied against the abutting property by the front-foot rule, except on a lot situated at the corner of another street. In the case of this lot, the amount to be assessed against it as a whole was determined by the frontage rule the same as in the case of other lots abutting on the improved street. By the Barrett law the first fifty feet back from the front line is primarily liable for the assessment and the remainder back to 150 feet is only secondarily liable. The first fifty feet of this lot was owned in three separate parcels. Mrs. Hudson owned the entire frontage. Her parcel extended back nineteen feet. Froeb and Morgan owned the next parcel, extending across the lot, having a width of eighteen and six tenths feet, and fronting on the side street. Mrs. Mack owned the third parcel within the fifty feet, extending across the lot, having a width of twelve and four tenths feet, and fronting on the side street. The engineer, in making his report, apportioned the assessment upon this lot among the three parcels in the ratio of actual benefits. The council, on the "hearing on such report and the assessments therein", approved and confirmed the apportionment by that method. On these facts, the assessment

against Mrs. Mack's property was declared to be void; and the following principles were established: That the engineer's report is the only legal basis on which any assessment can be made against any land whatever; that no assessment can be made except on an abutting lot; that such assessment can only be by the front foot; that the engineer can not lay nor can the common council adjudge an assessment on any other rule than frontage because no other basis or method is prescribed; that the revision goes only to the correction of errors, as indicated in *Garvin* v. *Daussman*, 114 Ind. 429. Among other things, the court said: "We have nothing to do with the policy, expediency or justice of the statute. * * * It is a well recognized rule in the interpretation of statutes, that the whole act and all its parts must be construed together so as to give effect to all the language employed, and inconsistent expressions are to be harmonized to reach the real intent of the legislature. The statute ought to be so construed as to make it a consistent whole. Sutherland Stat. Con., sections 239-246. It appears from the complaint and answer, that the engineer reported an estimate in favor of the contractors against the property-owners benefited thereby, to wit: Mary V. Hudson, on a strip or lot of ground on said Fifth street, 137.96 feet along said street and nineteen feet wide, $297.06; Froeb & Morgan, a strip or lot 137.96 feet long parallel with said street, 18.6 feet wide, adjoining the strip first described, $272.10; and Amanda D. Mack, a strip or lot 137.93 feet long, parallel with said street, adjoining the last described strip, and 12.4 feet wide, said strips or lots being lots one and two and a part of lot three, of said Blake's subdivision. *Such an estimate as this the engineer had no right to make.* He was required by the statute, as we have seen, to report the amount of such cost for improvement upon the ground bordering on the improved street, which amount he was required to ascertain and fix by multiplying the average cost price by the number

of front feet, also the name of the owner of the lot so bordering on said street. The name of the owner of such lot was Mary V. Hudson, and her lot being the only one that bordered on the improved street, the amount due upon it he was required to ascertain and fix by multiplying the average cost price per running foot by the number of running front feet of her lot. And this he was required to report to the common council, and such report the amended seventh section *required* the common council to *approve and confirm, or, in case it was incorrect, to cause it to be amended, and to make the assessment according to such report.* Therefore, if the statute had been followed by the city engineer and common council, the whole amount of cost of the improvement for which the whole 150 feet back from the line of Mrs. Hudson's lot bordering on the improved street could in any event be made liable, would have been assessed against Mrs. Hudson's lot number one. Without the proviso in section three, no person whose lot or ground does not border and abut on the improved part of the street could be made liable for any part of the cost of the improvement in any event. *Ray* v. *City of Jeffersonville,* 90 Ind. 567. But the proviso makes such land liable only in the event that the lots or parcels preceding it toward the front or border have proved insufficient to pay the cost of the improvement. And the amount for which such ground is in any event made liable is not fixed by any assessment or ascertainment either by the engineer or common council, but it is fixed and ascertained by the balance remaining unpaid of the whole amount assessed on the front lot or parcel after the exhaustion of the parcels that precede it to the front. That can not be known and ascertained until such preceding parcels have been sold. Therefore the act of the engineer in fixing and apportioning any amount against the appellee's lot was without authority of law and void, and the act of the common council in assessing said amount against appellee's lot was void, and she was entitled

to have it declared so." The engineer having made and the council having confirmed an assessment according to special benefits actually received, and their power to do so having been challenged, I can not see why the language used and a full consideration of the scope and intent of the Barrett law were not necessary to a decison of the question presented by the record. This case was considered from the point of view of Mrs. Mack. Look at it a moment from Mrs. Hudson's standpoint. She owned a parcel of land having 138 feet frontage and nineteen feet depth. The assessment for 138 feet frontage was $730.21. If her parcel, after being improved, would not sell for enough to pay the assessment, and back-lying parcels had to be sold to make up the deficiency,—and such cases have occurred under the Barrett law,—where do the special benefits come in? Though the legislature should declare as a matter of law, if it had the power, that the special benefits equaled the cost, it would be difficult for any one to point out wherein any special benefits as a matter of fact were derived from the proceeding. In *Keith* v. *Wilson*, 145 Ind. 149, May term 1896, it was stated: "The law assumes that the property will be benefited to an amount equal to the cost of the improvements thus made." In *Cason* v. *City of Lebanon*, 153 Ind. 567, it was claimed that a railroad company was bound by a contract with the city to improve the street and that therefore an ordinance *requiring the property owners to pay for the whole improvement* except street and alley crossings was invalid. This court declared that "Said contract did not deprive the city of the power to improve said street in the manner alleged in the complaint, at the expense of the abutting property owners, as provided by law." Though the statute was not particularly discussed in that case, it is sufficiently clear that the court considered, it settled that the law provided for the construction of street improvements, except street and alley crossings, "at the expense of the abutting property owners". In *Sands* v. *Hatfield*, 7 Ind.

App. 357, it was decided that, if the engineer omitted from his report any abutting property, the common council, on this fact being shown by objectors at the "hearing", should correct the report and alter the assessments to what they would have been if the engineer had performed his duties properly in the first instance.    The Appellate Court, on October 24, 1899, in *Indianapolis, etc., R. Co.* v. *Capital Paving, etc., Co.* (Ind. App.), 54 N. E. 1076, said: "Conceding that appellant's right of way is 'land' within the meaning of the charter, the question remains whether the right of way lying wholly within Kentucky avenue is within the designation of land abutting or bordering on the same avenue.   We think the statement of the question furnishes its own solution.   The city can assess only such lands as its charter designates, and, as the charter has designated lots or lands abutting or bordering on the street, none other can be assessed.   We are not authorized to give the words used in the statute other than their well-defined and commonly accepted meaning.   Conceding, without deciding or assuming, that the company's right of way is benefited by the improvement, the question is still unsolved, because the basis of the assessment is not property that will be benefited, but property that abuts or borders on the street.   In authorizing the construction of such improvements, the legislature has assumed that they will benefit that property which abuts or borders on the part of the street improved.   The right to impose such a tax is based upon a presumed equivalent.   It has not been assumed that any property other than that designated will be benefited. What property the local officers may believe will be benefited is not the question. If a property owner is an abutting owner, he must bear his share of the burden, because the legislature has so directed."   So it appears that the judicial department of this State has always hitherto entertained the same belief in regard to the scope and intent of the Barrett law that it did in regard to the street improvement laws prior to 1889. The legislature has

never indicated any dissent from this judicial interpretation, but on the contrary has shown its understanding and approval thereof.

The legislative department of this State made the method of assessment prescribed in the Barrett law conform to the constitutional requirements concerning taxation and compensation *as that department has always understood them.* That understanding was, in the language of Dillon (quoted in the dissenting opinion in *Norwood* v. *Baker*, 172 U. S. 269) that *"whether the expense* of making such improvements shall be paid out of the general treasury, or *be assessed* upon the abutting property or other property specially benefited, and, if in the latter mode, whether the assessment shall be upon all property found to be benefited, or *alone upon the abutters, according to frontage* or according to the area of their lots, is according to the present [then] weight of authority considered to be *a question of legislative expediency"*. The legislative department of this State has always understood that the only basis for special assessments was special benefits; but that it was a matter of legislative discretion to declare absolutely by law that *the special benefits were always and invariably equal to the cost of the improvement;* that, if in sewer and highway and drainage acts the equality of cost and benefit were not absolutely declared by law but were left open to the determination of the truth by the assessing officers, whose assessment of actual benefits was reviewable before some tribunal duly clothed with power and procedure to that end, it was a matter of legislative grace and not a matter of constitutional compulsion; and that, if the legislature chose to exercise its discretion by declaring that the cost of street improvements should be assessed upon the abutting property by frontage, the citizen could no more complain than in any other case in which the legislature had determined a question of legislative expediency. The Barrett law was enacted in 1889, and it was amended in 1891. It applies to all towns and

cities not specially classified. In 1891 the legislature passed an act concerning the government and powers of cities of 100,000 population (Indianapolis). Acts 1891 p. 137. On pages 175-181 are the provisions relating to street improvements. The method prescribed is to assess the cost upon the abutting property by frontage; and no provision is made in the act for a "hearing" before the council or board of public works, but the property owners have only the "hearing" described in *Garvin* v. *Daussman*, 114 Ind. 429. And, although at each subsequent session, acts regarding street improvements have been passed and the charter of Indianapolis has been amended, the legislature has seen no occasion for changing the foregoing method for paying for street improvements. In 1893 (Acts 1893 p. 56) the charter of Indianapolis was so amended that the cost of paving street and alley crossings, which had before been borne by the city was assessed against the property owners; but the charter was left unchanged so far as a "hearing" is concerned. At the same session, on March 3, 1893 (Acts 1893 p. 65), an act was approved relating to the government and powers of cities of 50,000 population (Evansville). On pages 104-110 are the provisions relating to street improvements. These provisions are the same as those in the charter of Indianapolis. On the same day, March 3, 1893 (Acts 1893 p. 202), an act was approved relating to the government and powers of cities of 35,000 population (Ft. Wayne). On pages 243-249 are the provisions relating to street improvements. These provisions are substantially the same as those in the charter of Indianapolis and Evansville, except that the Barrett law is followed in providing for a hearing upon the assessment before the board of public works. The case of *City of Terre Haute* v. *Mack*, 139 Ind. 99, was decided on October 16, 1894. *At the next session* of the legislature after this decision, on March 11, 1895 (Acts 1895 p. 239), an act was approved that amended the charter of cities of 35,000 inhabitants so that the total cost of the

improvement should be assessed by the front-foot rule upon the abutting property back to a line equidistant from the edge of the improved street and the next street parallel to it, but that, *if a lot belonged to different persons,* the assessment thereon should be apportioned among the several parcels *according to the benefits received* from the improvement by reason of being upon, near, or having access to it. Though other acts relating to street improvements were passed at this and each subsequent session, the act last above referred to remains the only instance in which the legislature has undertaken to prescribe the method of having the assessing officers assess and a tribunal determine special benefits *as a matter of fact* in street improvement cases. And though this act is a very limited and imperfect application of the principle, it clearly illustrates two things: First, that the legislature understood the difference between "frontage" and "actual benefits"; second, that the legislature acted, as it always has, upon the assumption, sustained by the then weight of authority, that it was purely a question of legislative expediency whether or not the legislature should declare *as a matter of law* that each front foot was specially benefited to the extent of its *pro rata* share of the total cost. On the same day March 11, 1895, an act was approved that amended the charter of cities of 50,000 inhabitants. Acts 1895, p. 258. Regarding street improvements the charter was so amended as to require the board of public works, after making out the final assessment roll, to give notice of a day "on which said board will receive and hear remonstrances from persons *with regard to their respective assessments.* On the day named in such notice said board shall proceed to hear and determine such remonstrances and may change, modify or confirm the same. Said assessment roll shall contain the names of the property holders and a description of the property assessed for such improvement, and shall contain the *pro rata* assessment against each piece of property. After hearing such remonstrances said department shall de-

liver *such* assessment roll as modified or confirmed to the department of finance." That the legislature intended in this, as in every other instance in which it was thought worth while to provide a "hearing" before a special tribunal, that the "hearing" should be upon the question whether or not the assessing officers had faithfully performed their duties according to statute and had correctly reported the assessments as determined by the method prescribed for them to act upon,—that the review should be for the purpose of determining the correctness of the view,—is explicitly shown in another provision of this same act. Regarding sidewalk improvements the charter was also amended so as to provide for a "hearing" after the assessment list has been prepared. "Upon the completion of said sidewalk said department shall cause to be prepared an assessment list, and shall notify such owner in the same manner as in this section above provided. Said notice shall fix a time and place when the owner may remonstrate against such assessment. On said day such owner may appear and remonstrate, *and the board shall take final action and shall assess such owner and such real estate for the cost of such improvement.*" On March 15, 1895, an act came into effect by which the charter of cities of 100,000 inhabitants was again amended. Acts 1895 p. 384. Some minor changes were made in respect to collection of instalments of assessments, etc., but the charter was not amended in the matters involved in the amendments of the charter of Ft. Wayne or of Evansville. At the next session on February 23, 1897 (Acts 1897 p. 56), an act was approved whereby the charter of Indianapolis was further amended in reference to street improvements. It is a matter of common knowledge that the practice was generally adopted by city treasurers of notifying property owners by mail of the amounts of their assessments after they came into the hands of the treasurers for collection, and to state in the notice that it was given voluntarily and not as a duty required. This amendment made the giv-

ing of such notice by mail obligatory upon the treasurer of Indianapolis, and further required him to publish a notice to all persons who had failed to avail themselves of the privilege of paying in instalments that unless payment was made within thirty days proceedings for the collection of assessments would be instituted. On February 26, 1897, the charter of Indianapolis was further amended. Acts 1897 p. 79. Some details about the cost of street and alley intersections, the issue of bonds, and the collection of instalments were changed; but the proceedings for fixing the final assessments by the board of public works were left as they were prescribed in the original act of 1891. At the last session of the legislature, on February 2, 1899, an act came into effect, by which the Barrett law as applied to cities between 5,800 and 5,910 population was amended. Acts 1899, p. 8. It provides for the collection of the total cost, including that of street and alley crossings, from the abutters in proportion to frontage. On March 3, 1899, an act was approved that related to the government and powers of cities of 23,000 population (Terre Haute). Acts 1899 p. 270. In its essential features it is the same as the charters of Evansville and Ft. Wayne. On pages 314-322 are the provisions concerning street improvements. The assessments for that purpose are to be made by the front-foot rule. But the assessments for sewer construction, according to the directions of every one of these acts, are to be laid upon the lands found to be benefited and are to be apportioned according to and not exceeding the special benefits actually received. On the same day, March 3, 1899, an act was approved that again amended the charter of Indianapolis in reference to street improvements. Acts 1899 p. 399. The amendment provides for an appraisement of the abutting property exclusive of improvements, and forbids the ordering of any improvement which, when completed, is to cost more than 25 per cent. of the aggregate appraised value. This still leaves any parcel of abutting property liable to an

assessment by frontage that might exceed the value of that parcel. And the "hearing" before the council or board of public works as to the correctness of the assessments, on which the present construction of the Barrett law is built up, has remained unprovided for to the end. Is it conceivable that the legislature foresaw the "new" constitution and entertained the deliberate design of making some of these acts constitutional and others unconstitutional? Assuredly not. This whole series of acts, from the Barrett law of 1889 to the last amendment of the charter of Indianapolis in 1899, evidences a continuous and consistent legislative policy. That policy was to put street improvements upon a different basis from sewers and ditches and roads and other like special proceedings. These street improvement statutes are the ones my brethren should have examined, if they were seeking acts *in pari materia* by which to determine the scope and intent of the Barrett law. The sewer and ditch and gravel road laws are only *in pari materia* with the sewer law interwoven in the act of 1889, which my brethren pass by without notice. The legislature never doubted that it had the power to do as it did. It assumed that it was purely a question of legislative expediency to require the whole cost of street improvements to be assessed upon the property by the running foot.

The administrative department of the State, as represented in the various towns and cities, have uniformly acted under the law on the same assumption. It is a matter of common knowledge that the people, the lawyers, the contractors, the municipal officers, the legislature, and the courts, have all been in accord in the understanding that under the Barrett law the city paid for street and alley crossings and the abutters paid the rest of the total cost of street improvements according to a uniform rate per front foot,—until the exigency arose, after the Norwood-Baker decision was studied, of hunting for some other meaning.

If the continuous and consistent interpretation of the

Barrett law, during all the years since its passage, by all the departments of the State, were looked to, and if the canons of construction as laid down in the books were followed, that construction should be accepted as decisive.

Thus far I have been stating the reasons why I am unable to join my brethren in finding in section seven the "implied power" that authorizes the council to change the basis of the assessments. But it seems to me there is a vital difference between a power and a duty, between the right to do a thing and the obligation to do it. In this case the record shows it is admitted that the council has already decided that it will not accord the property owners a hearing on the question of the amount of special benefits actually conferred by the improvement. Where is the command in the statute that forbids the council from basing the assessments upon the report of the engineer after it has been amended, if necessary, to conform to what the statute commanded the engineer to do in the first instance? If the legislature delegated to the council a discretion in the matter, the property owners could not base a suit for mandatory injunction upon what they deemed a mistaken exercise of that discretion. The statute says that the council "may adopt, alter or amend the engineer's report and the assessments therein," not "shall change the basis of assessments". The statute permits the council to pay all or any part of the total cost of the improvement out of the treasury. This is purely and simply a matter of option. If the council paid the total cost, there would be no assessments. If the council determined to pay a certain portion of the total cost, the residue of the total would have to be assessed against the abutting property in the method provided by the statute. In this case the record shows it is admitted that the council has already ordained that the total cost shall be borne by the abutters. Now, if the improvement is to cost $10,000 and it should be found on the supposed "hearing" that the aggregate of special benefits actually received by the several

parcels of abutting property was only $8,000 (though the complaint avers and the demurrer admits that the abutting property is not specially benefited at all as a matter of fact), what good would it do to have the total cost apportioned among the abutters in the ratio of the special benefits as among themselves? Each abutter would find his property assessed with 125 per cent. of his special benefits. So, it becomes necessary to find, both in the law and in appellee's ordinance under the law, not only the right but the duty to pay the $2,000 excess out of the general treasury, although it is agreed that the city ordered the improvement with the intention, and in the belief that it had the power, to ordain "that the cost and expense thereof, including advertising, labor and material for the same, be assessed against the property on the line". And in the opinion filed by my brethren, though I notice that considerable attention is given to making out the "implied power", I fail to find anything but a fiat that transforms the "implied power" into an "imperative duty".

The views I entertain are supported by authority. In *Hutcheson* v. *Storrie*, 92 Tex. 685, 51 S. W. 848, 45 L. R. A. 289, and in *Lyon* v. *Town of Tonawanda*, 98 Fed. 361, statutes were involved that are essentially the same as the Barrett law; and in *Charles* v. *City of Marion*, 100 Fed. 538, the Barrett law was considered. I may also cite the last page of my brethren's opinion, wherein the rules regarding "implied powers" are properly indicated.

Not only am I constrained to believe that the Barrett law as enacted is unconstitutional, but I am also of the opinion that the Barrett law as now construed by my brethren is unconstitutional. And I will suggest some of the reasons for thinking so.

The taxing power is committed to the legislative department and can not be conferred upon the judicial. All assessments must be made by administrative officers whose sole authority is to follow with substantial strictness the method

pointed out by law. The property owner is entitled to a "day in court" to challenge the assessment. The court can not make the assessment, but can only hear the challenge of the assessment already made and then enter judgment confirming or correcting the assessment. If the engineer does not make the assessment as an administrative officer, and if the council does not merely review the assessment as a court, but if on the contrary no assessment is made until the council makes it on the "hearing", the result is either that the assessment is made by a judicial tribunal, or that the "hearing" is for the purpose of enabling an administrative body to determine what assessment to make, with no opportunity for the property owner thereafter to challenge its correctness. A common council may at one time exercise legislative, at another administrative, and at another judicial, functions; but it can not have two or three characters at the same time.

If the prescribed mode of fixing assessments by frontage is deleted from the statute as enacted, there is not a word left limiting the council to any method or prescribing any rule of procedure whatever. There would likely be as many methods as there are towns and cities in the State. Uncertainty would probably prevail until, in suits involving the Barrett law as now construed, this court formulated a definite and uniform procedure. I can not concur in the statement that "The absence of an express rule for guidance in the exercise of the power does not impair it. It is sufficient if the power to change the assessment from the frontage rule exists". Regulations and methods in all tax matters must be prescribed by law. *State Board* v. *Holliday*, 150 Ind. 216, 42 L. R. A. 826. In the syllabus of *Barnes* v. *Dyer*, 56 Vt. 469, it is said: "A statute empowering the authorities of a city to construct sidewalks and make local assessments on the property fronting the same 'for so much of the expense thereof as they *shall deem just and equitable*', is unconstitutional, in that there is no fixed, cer-

tain, and legal standard for assessment." In *New Brunswick Rubber Co* v. *Commissioners, etc.*, 9 Vroom 190, 20 Am. Rep. 380, the following appears: "It is not sufficient that the legislative act merely declares that the cost, or a part of the cost of the improvement, shall be assessed upon the lots drained by the sewers to be built. It must, as well, establish some rule—some definite scheme—within constitutional limits, for the apportionment of the tax upon the lands on which such special burthen is imposed. An act of the legislature, directing a tax for a local improvement to be imposed upon particular lands, to be legal or effectual, must consist of something more than a mere authorization to assess a sum of money, the cost of a local improvement upon the designated property—the act must determine the mode of distributing the burthen; the property out of which the tax is to be made must be designated, and some certain standard of assessments established; it cannot properly be left by the *legislature* to the discretion of *others* to fix the method." Courts, for example. A property owner is entitled to a law that operates according to constitutional principles without his intervention. According to the Barrett law as now construed, a property owner does not have a tax that is assessed on the basis of his actual special benefits without affirmative action on his part at the "hearing" to see that it is put on that basis. Further, a lawful assessment must show on its face the principle according to which it is laid. *New Brunswick Rubber Co.* v. *Commissioners, supra.* This would appear under the Barrett law as enacted, but not as construed. It seems to me that the property owner is subjected to a tax "without due process of law".

The abutters alone are named in the engineer's report. My brethren hold that all such persons are bound by the published notice to know that assessments will be made at the hearing which shall correspond with special benefits actually received. They do not hold, as I understand them, that persons who are not abutters must take notice that their

back-lying property will be assessed for actual benefits. The Barrett law as enacted made such persons secondarily liable. This was so, as was pointed out in *City of Terre Haute* v. *Mack*, 139 Ind. 99, not because they were included in the assessment either as made by the engineer or as confirmed by the council, for they were not, but because the statute made them sureties, so to speak. Now, under the Barrett law as enacted, the legislature created a uniform taxing district, over all of which the contractor had his lien. But under the Barrett law as construed, an irregular district is created, without any valid reason inhering in the subject-matter of the act to warrant the irregularity; and the lien of the contractor is to that extent diminished. If A owns a parcel having fifty feet frontage and 150 feet depth, and B owns a parcel having fifty feet frontage and twenty feet depth, and C owns a parcel having fifty feet width and 130 feet depth and lying back of B's parcel, it seems to me that, if A is liable for actual special benefits on his 7,500 square feet, and B is liable on his 1,000 square feet, and C is not liable at all on his 6,500 square feet, not only is the taxing district irregular without reason, but the parties are not subjected to a "uniform and equal rate of assessment".

The notice provided for in section seven is not sufficient to give the council jurisdiction over any subject except "objections" nor any person except one "aggrieved". In *Kuntz* v. *Sumption*, 117 Ind. 1, 7, 2 L. R. A. 658, the court said of the board of equalization statute: "It does provide notice sufficient for two classes of judgments, but for no others. It provides for notice sufficient as to all general changes in the levy, and sufficient as to all who have complaints to make, and over these matters jurisdiction arises when the notice is given as the statute directs. But there is no provision for notice to the individual taxpayer whose list is to be added to or whose valuation is to be increased. * * * This notice, it is obvious, can not require every

taxpayer in the county to be in attendance at the meeting of the board to see that no additions are made to his list."

The contract is made between the contractor and the council for the city. Under the Barrett law as enacted, the liability of the city was limited to the cost of street and alley crossings; and under section seven the council had no discretion, and no duty but to see that the balance of the cost was properly apportioned among the property owners according to frontage. The council, for the city, has control of the expenditure of the general fund; but, under the Barrett law as enacted, no conflict of interest arose among the council and the property owners and the contractor. Under the Barrett law as construed, however, a three-cornered conflict of interests at once arises, and the council is made the exclusive and final judge in its own case. In *Board, etc.,* v. *Heaston,* 144 Ind. 583, 55 Am. St. 192, it was held that a board of county commissioners in allowing or disallowing claims against the county acted merely in the capacity of an auditing committee. The court said: "If it was a suit against the county for the recovery of money in the sense urged by counsel, then the claimant was the plaintiff and the county the defendant, and the commissioners were in the discharge of a double duty: acting as a court; and also as the representative of the defendant, or otherwise the county could not be said to be in court. Such a construction as contended for apparently leads to an absurdity. It would follow that the court and the party defendant were virtually the same. It is an axiom of the law that no man can be a judge in his own case." A proper method of giving the people "due process of law" is illustrated in our statute in reference to the opening of streets. In that statute it is recognized that the general treasury will be subjected to an indefinite liability, and the city is not made the exclusive and final judge in its own case.

On the whole, it seems to me that my brethren in steering away from the rock of Scylla have plunged into the whirlpool of Charybdis.